Argued and submitted June 13, 2013, decision of Court of Appeals affirmed, judgment of circuit court affirmed in part and reversed in part, and case remanded for further proceedings May 15, 2014

STATE OF OREGON,
*Petitioner-Respondent on Review,*

*v.*

MARK N. BABSON,
*Respondent-Petitioner on Review.*

(CC 09C41582; CA A144037 (Control);
SC S060455 (Control); SC S060610)

STATE OF OREGON,
*Petitioner-Respondent on Review,*

*v.*

MICHELE C. DARR,
*Respondent-Petitioner on Review.*

(CC 09C41583; CA A144037 (Control); CA A144038;
SC S060455 (Control); SC S060610)

STATE OF OREGON,
*Petitioner-Respondent on Review,*

*v.*

TERESA L. GOOCH,
*Respondent-Petitioner on Review.*

(CC 09C41584; CA A144037 (Control); CA A144039;
SC S060455 (Control); SC S060610)

STATE OF OREGON,
*Petitioner-Respondent on Review,*

*v.*

MARGARET M. MORTON,
*Respondent-Petitioner on Review.*

(CC 09C41593; CA A144037 (Control); CA A144042;
SC S060455 (Control); SC S060610)

STATE OF OREGON,
*Petitioner-Respondent on Review,*

*v.*

GEORGE G. MEEK,
*Respondent-Petitioner on Review.*

(CC 09C41594; CA A144037 (Control); CA A144043;
SC S060455 (Control); SC S060610)

STATE OF OREGON,
*Petitioner-Respondent on Review,*

*v.*

GREGORY J. CLELAND,
*Respondent-Petitioner on Review.*

(CC 09C41581; CA A144037 (Control); CA A144345;
SC S060455 (Control); SC S060376)

326 P3d 559

Timothy R. Volpert, Portland, on behalf of ACLU Foundation of Oregon, Inc., argued the cause and filed the briefs for respondent-petitioner on review Mark N. Babson, Michele C. Darr, Teresa L. Gooch, Margaret M. Morton, and George G. Meek. With him on the briefs were Alan J. Galloway, Tim Cunningham, and Michael E. Swaim.

Jossi Davidson, Silverton, on behalf of ACLU Foundation of Oregon, Inc., argued the cause and filed the brief for respondent-petitioner on review Gregory J. Cleland.

Carson L. Whitehead, Assistant Attorney General, and Anna M. Joyce, Solicitor General, argued the cause and filed the briefs for petitioner-respondent on review State of Oregon. With them on the briefs was Ellen F. Rosenblum, Attorney General.

Dexter A. Johnson, Legislative Counsel, Salem, filed a brief for *amicus curiae* Oregon Legislative Assembly in S060455.

BALMER, C. J.

**BALMER, C. J.**

Defendants held an around-the-clock vigil on the steps of the state capitol building to protest the deployment of Oregon National Guard troops to Iraq and Afghanistan. During that vigil, the state police cited defendants for second-degree criminal trespass when they remained on the capitol steps after 11:00 p.m., in violation of a Legislative Administration Committee (LAC) guideline that prohibited "[o]vernight use" of the steps between 11:00 p.m. and 7:00 a.m., except in limited circumstances. Defendants challenged those citations, arguing that the LAC guideline was unconstitutional under Article I, section 8, and Article I, section 26, of the Oregon Constitution—the provisions protecting free expression and the right to assemble, instruct representatives, and apply for redress of grievances. Defendants also argued that the LAC guideline violated the First Amendment to the United States Constitution. The trial court rejected those arguments and found defendants guilty of second-degree criminal trespass. On appeal, the Court of Appeals similarly rejected defendants' facial challenges to the guideline under the Oregon Constitution, but remanded defendants' as-applied challenges to allow defendants to question the legislator co-chairs of the LAC about enforcement of the guideline. Because defendants' state constitutional challenges were unresolved, the Court of Appeals did not reach defendants' First Amendment argument. *State v. Babson*, 249 Or App 278, 307-08, 279 P3d 222 (2012).

On review, defendants renew their challenges to the guideline under Article I, section 8, and Article I, section 26, of the Oregon Constitution, as well as under the First Amendment. The state also sought review, arguing that the Court of Appeals erred when it determined that defendants could support their as-applied challenges under the Oregon Constitution by questioning the two legislator co-chairs of the LAC about "any instructions or other communications" that they might have given or had regarding enforcement of the guideline against defendants. *Id.* at 302. The state asserts that Article IV, section 9, of the Oregon Constitution—the Debate Clause—bars defendants from questioning those legislators.

For the reasons set out below, we affirm the Court of Appeals. We conclude that the LAC guideline, on its face, does not violate Article I, section 8, or Article I, section 26, of the Oregon Constitution. To determine whether the LAC guideline was applied unconstitutionally to defendants' expression and assembly, however, we must remand to permit defendants to question the legislator co-chairs of the LAC about their involvement, if any, in enforcement of the guideline against defendants. Taking that testimony into account, the trial court must determine whether enforcement of the guideline against defendants was an impermissible restriction on their protected activities or whether it was a reasonable restriction on the time, place, and manner of their expression and assembly. Because of our resolution of that issue, we do not reach defendants' First Amendment argument.

## I. FACTS AND PROCEEDINGS BELOW

On November 1, 2008, on the steps of the state capitol, Darr began a protest against the deployment of Oregon National Guard troops to Iraq and Afghanistan.[1] Darr chose the capitol steps as the location for her protest because it was the seat of state government "where decisions are made" and because it was a "very public place." The goal of the protest was to compel the Governor to meet with members of the National Guard and their families, to bring public attention to the pending deployment of the National Guard, and, when the legislature was in session, to persuade the legislature to support a bill and resolutions aimed at allowing and encouraging the Governor to avoid deploying the National Guard.

Darr's protest took the form of an around-the-clock vigil on the capitol steps, and included fasting, lighting candles, displaying signs, and speaking with the general public, veterans, members of the National Guard, and legislators. The other defendants joined the vigil at different times, and

---

[1] Where it is necessary to differentiate between defendants, we do so by referring to them by their last names. Cleland filed a separate brief, arguing that the guideline violates Article I, section 26, of the Oregon Constitution, but because we understand all defendants to be incorporating each others' arguments, we do not differentiate between defendants' arguments.

participated in the vigil for varying lengths of time. Some joined the vigil on the capitol steps as early as November 2008, while at least one defendant joined the vigil for a single night in February 2009.

Use of the capitol steps is regulated by the LAC, which is a joint committee of the Legislative Assembly that, among other things, is charged with making policies for control of the state capitol. *See* ORS 173.710 (establishing the LAC); ORS 173.720(1)(g) (describing the duties of the Legislative Administrator, who acts "[p]ursuant to the policies and directions" of the LAC, to include "[c]ontrol [of] all space and facilities within the State Capitol and such other space as is assigned to the Legislative Assembly"); ORS 173.770(1) (providing that the LAC "may adopt rules to carry out its duties"). At the time that Darr began her vigil, the LAC Policies and Guidelines included a guideline regarding overnight use of the capitol steps that read, "Activity shall be held between 7:00 am and 11:00 pm, unless otherwise authorized by the Legislative Administrator. No overnight use." That guideline had been in place for at least eight years, since 2000. After Darr began her vigil, the LAC discussed that guideline at two different meetings. As discussed below, in November 2008, the LAC clarified that it intended the guideline to prohibit overnight use of the capitol steps, and in January 2009, the LAC amended the guideline to remove the Legislative Administrator's discretion to allow overnight use of the steps. The citations at issue in this case occurred after the January 2009 amendment.

The LAC first discussed the guideline at a meeting on November 13, 2008, twelve days after Darr began her vigil. At that meeting, members of the LAC stated that the guideline had not been enforced consistently, because the prior Legislative Administrator had authorized groups, on request, to use the capitol steps between the hours of 11:00 p.m. and 7:00 a.m.[2] The LAC voted to "reaffirm[]" the existing guideline, including the portion of the guideline that

---

[2] At trial, Darr testified that she never sought authorization from the Legislative Administrator to be on the capitol steps between 11:00 p.m. and 7:00 a.m.

permitted the Legislative Administrator to authorize over-night use of the steps, but the LAC indicated that it intended the guideline to prohibit use of the steps between 11:00 p.m. and 7:00 a.m. The Legislative Administrator understood the LAC to be directing him to deny any requests for use of the steps between 11:00 p.m. and 7:00 a.m., despite the guideline's text allowing him to authorize overnight use.

That same day, the Legislative Administrator delivered a letter to Darr, advising her of the text of the reaffirmed guideline and directing her to leave the steps by 11:00 p.m. that night and every night to avoid violating the guideline. Darr did not leave the steps, and that night, shortly after 11:00 p.m., the Oregon State Police cited Darr on the capitol steps for second-degree criminal trespass. Two days later, in the early morning hours of November 15, 2008, the state police again cited Darr for second-degree criminal trespass for being on the capitol steps after 11:00 p.m. and before 7:00 a.m. The district attorney did not prosecute those citations, and, as a result, those citations are not at issue in this case. Darr continued her vigil, and, as noted, the other defendants joined her vigil as it progressed.

A second LAC meeting occurred a few months later, in January 2009. At that meeting, the LAC amended the text of the capitol steps guideline to remove the Legislative Administrator's discretion to permit use of the steps between 11:00 p.m. and 7:00 a.m.: "Overnight use of the steps is prohibited, and activities on the steps may be conducted only between 7:00 am and 11:00 pm, or during hours between 11:00 pm and 7:00 am when legislative hearings or floor sessions are taking place." One month later, in February 2009, the state police cited defendants for remaining on the capitol steps between 11:00 p.m. and 7:00 a.m. as part of their vigil. Those are the citations that defendants challenge before this court.

The February citations were charged as violations. Defendants challenged those violations by arguing that the LAC guideline was procedurally unconstitutional and that it violated their rights under Article I, section 8, and Article I, section 26, of the Oregon Constitution, as well as under the First Amendment to the United States Constitution. The

trial court rejected those arguments and found defendants guilty of second-degree criminal trespass under ORS 164.245(1), which provides that "[a] person commits the crime of criminal trespass in the second degree if the person enters or remains unlawfully *** in or upon premises." A person "enters or remains unlawfully" when "the premises, at the time of such entry or remaining, are not open to the public or when the entrant is not otherwise licensed or privileged to do so." ORS 164.205(3)(a). Defendants' presence on the capitol steps was "unlawful[]" because the LAC guideline prohibited use of the steps between 11:00 p.m. and 7:00 a.m.

On appeal, defendants renewed their arguments that the LAC guideline both was procedurally unconstitutional and violated defendants' substantive constitutional rights under Article I, section 8; Article I, section 26; and the First Amendment. *Babson*, 249 Or App at 282, 284. The Court of Appeals first rejected defendants' procedural arguments, concluding that the legislature has the power to promulgate rules regarding access to the capitol under Article IV, section 17, of the Oregon Constitution, which provides that "[e]ach house shall have all powers necessary for a chamber of the Legislative Branch, of a free, and independent State." *Id.* at 283. The court further noted that, in some instances, the Oregon Constitution authorizes the Legislative Assembly to enact rules outside the formal legislative process, which supported the court's conclusion that enactment of the guideline outside the formal legislative process was not inherently unconstitutional. *Id.* Moreover, the court reasoned, the guideline did not offend principles of separation of powers because neither the LAC's authorizing statutes nor the LAC guidelines purported to give the LAC enforcement authority, as defendants had contended.[3] *Id.* at 284.

Turning to defendants' challenge under Article I, section 8, of the Oregon Constitution, the Court of Appeals employed the framework described in *State v. Robertson*, 293 Or 402, 649 P2d 569 (1982). This court has described

---

[3] Defendants renew their procedural arguments on review. We reject them without discussion.

the *Robertson* framework as consisting of three categories. *See State v. Plowman*, 314 Or 157, 164, 838 P2d 558 (1992), *cert den*, 508 US 974 (1993) (describing three categories of *Robertson* framework). Under the first category, the court begins by determining whether a law is "written in terms directed to the substance of any 'opinion' or any 'subject' of communication." *Robertson*, 293 Or at 412. If it is, then the law is unconstitutional, unless the scope of the restraint is "wholly confined within some historical exception that was well established when the first American guarantees of freedom of expression were adopted and that the guarantees then or in 1859 demonstrably were not intended to reach." *Id.* If the law survives that inquiry, then the court determines whether the law focuses on forbidden effects and "the proscribed means [of causing those effects] include speech or writing," or whether it is "directed only against causing the forbidden effects." *Id.* at 417-18. If the law focuses on forbidden effects, and the proscribed means of causing those effects include expression, then the law is analyzed under the second *Robertson* category. Under that category, the court determines whether the law is overbroad, and, if so, whether it is capable of being narrowed. *Id.* If, on the other hand, the law focuses only on forbidden effects, then the law is in the third *Robertson* category, and an individual can challenge the law as applied to that individual's circumstances. *Id.* at 417.

In this case, the Court of Appeals noted that defendants had argued that the guideline should be analyzed under the second *Robertson* category, so the court proceeded directly to that analysis. *Babson*, 249 Or App at 286. The court concluded that the guideline did not "fall into the second category" because the guideline did not "specify a harm and 'expressly' provide that speech or some other form of intentionally communicative activity [was] one way to cause that harm." *Id.* at 286-87. The court reasoned that a law must expressly refer to speech to be in the second *Robertson* category because if "a speech-neutral statute could be declared unconstitutional if its enforcement in some circumstances could interfere with constitutionally protected activity," the effects would be far reaching. *Id.* at 287. The court posited that such a rule could result in the invalidation of

every trespass and arson statute, because those statutes can be enforced to stifle speech and expression. *Id.* Therefore, because the guideline was speech neutral, the court concluded that defendants could challenge the guideline only under the third category of the *Robertson* framework, as a law that focused on forbidden effects and had been unconstitutionally applied to their protected expression. *Id.*

In analyzing defendants' as-applied challenge under the third category of *Robertson*, the Court of Appeals determined that the relevant inquiry was "whether the state's enforcement of the overnight rule against defendants was directed toward defendants' expression or toward some speech-neutral objective." *Id.* at 290. Although the court found evidence in the record to support the trial court's statement that enforcement of the guideline was not based on the content of defendants' speech, the Court of Appeals noted that it was not required to affirm if erroneously excluded evidence could have affected the outcome of the case. *Id.* at 290-91. In particular, defendants argued that the trial court had erred in refusing to allow them to question the Legislative Administrator about any discussions that he had had with legislators regarding enforcement of the guideline. The Court of Appeals rejected that argument because defendants had failed to make the necessary offer of proof. *Id.* at 292-93. Defendants also argued that the trial court had erred in quashing their subpoenas of the legislator co-chairs of the LAC, whom defendants had wanted to question about enforcement of the guideline. To address that argument, the Court of Appeals analyzed Article IV, section 9, of the Oregon Constitution—the Debate Clause—and concluded that "defendants were entitled to question the legislators, but only about any instructions or other communications that they might have given to or had with the LAC administrator or others regarding *enforcement* (as opposed to *enactment*) of the overnight rule." *Id.* at 302 (emphasis in original).

The Court of Appeals reached similar conclusions when it applied the *Robertson* framework to defendants' challenge under Article I, section 26, of the Oregon Constitution. The court first reasoned that the guideline was "assembly neutral" because it did not "expressly mention" any of the

activities protected under Article I, section 26, nor did it "necessarily imply" that it regulated any of those activities. *Id.* at 306. As a result, the court concluded that defendants could challenge the guideline under Article I, section 26, only under the third category of *Robertson* as applied to their circumstances. Similarly to its analysis of the as-applied challenge under Article I, section 8, the court went on to note that defendants were entitled to question the LAC co-chairs about enforcement of the guideline to support their as-applied argument under Article I, section 26. *Id.* at 307-08.

The Court of Appeals reversed and remanded so that defendants could question the subpoenaed legislators about enforcement of the guideline. *Id.* at 308. Because of the potential to resolve defendants' claims under the state constitution on remand, the court determined that it was premature to address defendants' arguments under the First and Fourteenth Amendments to the United States Constitution. *Id.* at 307.

On review, defendants renew their arguments under Article I, section 8; Article I, section 26; and the First Amendment. For its part, the state argues that the Court of Appeals erred when it determined that the Debate Clause of the Oregon Constitution does not shield the two legislator co-chairs of the LAC from being subpoenaed and questioned about enforcement of the guideline against defendants. We begin with defendants' challenge under Article I, section 8, of the Oregon Constitution.

## II.   ARTICLE I, SECTION 8, OF THE OREGON CONSTITUTION

Article I, section 8, of the Oregon Constitution provides, "No law shall be passed restraining the free expression of opinion, or restricting the right to speak, write, or print freely on any subject whatever; but every person shall be responsible for the abuse of this right."

For more than thirty years, this court has analyzed claims under Article I, section 8, using the framework that is described in *Robertson*, 293 Or 402. As explained above, under the first category of the *Robertson* framework, a law that is "written in terms directed to the substance of any

'opinion' or any 'subject' of communication" is unconstitutional unless the restriction is wholly confined within an historical exception. *Id.* at 412. If the law passes that test but "is directed in terms against the pursuit of a forbidden effect" and "the proscribed means [of causing that effect] include speech or writing," then the law falls into the second category of *Robertson* and is examined for overbreadth. *Id.* at 415, 417-18. If a law is "directed only against causing the forbidden effects," it falls into the third category of *Robertson. Id.* at 417. A law that falls into the third category can be challenged by arguing that the law "could not constitutionally be applied to [a person's] particular words or other expression." *Id.* Defendants argue that the guideline is unconstitutional under each of the three categories of the *Robertson* framework.[4]

## A.   Robertson *Category One*

Analysis under the first category of *Robertson* is focused on the text of the law. The court in *Robertson* framed the inquiry as whether the statute was "written in terms" directed at speech. 293 Or at 412. In subsequent cases, this court continued to emphasize the text of statutes when analyzing them under the first category. In *City of Portland v. Tidyman*, 306 Or 174, 184, 759 P2d 242 (1988), for example, this court rejected the city's argument that an ordinance restricting the location of adult businesses was focused only on the effects of speech. The court stated that, "If the ordinance *were so written*, it might well be valid on its face and subject only to scrutiny for valid administration; but *it is not so written.*" *Id.* (emphasis added). In *Tidyman*, statutory context in the form of legislative findings about the harmful effects of adult businesses could not save the statute because "[i]t is the operative text of the legislation * * * that people must obey and that administrators and judges enforce." *Id.* at 184-85. In that case, the court concluded, the operative text targeted the content of expression because it regulated "adult businesses"—that is, only certain businesses, based

---

[4] Defendants argue, and the state does not dispute, that the analysis stated in *Robertson* applies to government limitations on expressive activity on the state capitol steps. We agree. We need not and do not express any opinion as to whether a different analysis would apply to limitations on expressive activities that occur on other types of government property.

on the content of the expressive materials they sold—rather than the supposed harmful effects of those businesses. *Id.* at 184-86. Thus, in analyzing a law under the first category of *Robertson*, this court has looked to the text of the law to see whether it expressly regulates expression. *See also City of Hillsboro v. Purcell*, 306 Or 547, 555, 761 P2d 510 (1988) (concluding that city ordinance was valid under the first category of *Robertson* because it "prohibit[ed] uninvited entries to private property or 'calling at residences,' but it [did] not by its terms prohibit speech").

Defendants do not argue that the guideline is "written in terms" directed at expression or the content of expression. They nonetheless argue that the guideline is unconstitutional under the first category of *Robertson*. According to defendants, when determining the "focus" of a law under the first category of *Robertson*, the analysis must extend beyond the text to include context and legislative history. *See State v. Gaines*, 346 Or 160, 171-72, 206 P3d 1042 (2009) (describing statutory interpretation framework in which court examines text, context, and legislative history). In this case, defendants argue that application of the statutory interpretation framework shows that the focus of the guideline was on ending protests, particularly defendants' vigil, and that the law therefore is invalid under *Robertson* category one.

Defendants are correct that, since *Robertson*, some of our cases have looked beyond the text of statutes when analyzing them under Article I, section 8. As defendants note, for example, in *State v. Stoneman*, 323 Or 536, 544, 920 P2d 535 (1996), this court concluded that a law regulating child pornography, by its terms, "described and prohibited commerce in certain forms of communication." Citing *PGE v. Bureau of Labor and Industries*, 317 Or 606, 610-11, 859 P2d 1143 (1993), the court went on to examine the statute's context, however, to determine whether the analysis should proceed under the first or the second category of *Robertson* because the statute at issue "prohibited commerce in material, the production of which *necessarily* involve[d] harm to children." *Stoneman*, 323 Or at 545-48 (emphasis in original). The court concluded that the statute should be analyzed under the second category of *Robertson* because the legislature intended to regulate the products of

"the underlying acts of sexual exploitation of children," and not the "communicative *substance*" of the expressive materials. *Id.* at 545, 548 (emphasis in original). The court found support for its conclusion that the statute was directed at harm to children, and not at the communicative substance of the materials, in the context of the statute. *Id.* at 546-48. *Stoneman* therefore provides support for defendants' argument that the court should consider context and legislative history in its analysis under the first category of *Robertson*.

This court typically has looked to context and legislative history in Article I, section 8, cases, however, only when there is some question regarding the legislature's intent regarding the meaning or scope of the text of the statute. In *Stoneman*, for example, the court looked at statutory context to determine whether the legislature intended the text of the statute at issue to regulate expression or the harm inherent in production of that expression, because the text of the statute referred to expressive materials, but the court noted that the production those materials necessarily involved harm to children. *Stoneman*, 323 Or at 546-48; *see also State v. Ray*, 302 Or 595, 598, 733 P2d 28 (1987) (citing legislative history to support conclusion that law prohibiting harassment "by telephonic use of obscenities" or certain other language was intended to "protect persons from actual injury, not to restrict the content of speech"); *State v. Chakerian*, 325 Or 370, 378-80, 938 P2d 756 (1997) (examining context to determine whether text proscribing "tumultuous and violent conduct" was intended to reach protected expression under the second category of *Robertson*); *State v. Ausmus*, 336 Or 493, 499-503, 85 P3d 864 (2004) (examining text and context to "discern the conduct that [the statute] proscribes"). If the meaning or scope of the text of a statute is not in dispute, there is generally no need to apply the statutory interpretation framework described in *Gaines*.

Here, the parties do not disagree about the LAC's intent behind the meaning or scope of the text of the guideline. Although the parties disagree about the LAC's reason for reaffirming and amending the guideline, the parties agree that the guideline prohibits all overnight use of the capitol steps, including protests like defendants' vigil. They also agree that a person can violate the guideline without

engaging in expressive activities, if, for example, a person uses the steps as a shortcut while crossing the capitol grounds after 11:00 p.m. (when there are no hearings or floor sessions taking place). In addition, defendants' counsel conceded at oral argument that there are no ambiguous terms in the guideline that require further explanation using context and legislative history. For those reasons, defendants have not demonstrated why this court should examine context and legislative history, when there is no debate about the meaning of the guideline or the conduct that it covers.[5] Because the guideline is not "written in terms directed to the substance of any 'opinion' or any 'subject' of communication," it is not unconstitutional under the first category of *Robertson*.

B.  Robertson *Category Two*

A law falls under the second category of *Robertson* if it is "directed in terms against the pursuit of a forbidden effect" and the "the proscribed means [of causing that effect] include speech or writing." 293 Or at 415, 417-18. The court examines a statute in the second category for overbreadth

---

[5] Even if we were to accept defendants' assertion that we should consider context and legislative history, we are not persuaded that that evidence shows that the LAC's removal of the Legislative Administrator's discretion to allow overnight use of the steps was directed at expression. The context on which defendants rely—other provisions of the LAC guidelines that regulate specific harms associated with use of the capitol steps, such as alcohol use and litter—does not illuminate the LAC's decision to amend the rule. The fact that other LAC guidelines regulated some of the harms that members of the LAC identified when discussing the overnight guideline does not necessarily mean that the LAC's removal of the Legislative Administrator's discretion was directed at speech. In fact, multiple LAC members indicated that they were concerned about consistent enforcement of the guideline. That concern suggests that the LAC may have been attempting to *avoid* restrictions based on expression or the content of expression. In other words, by taking away the Legislative Administrator's discretion, the LAC ensured that the Legislative Administrator would not enforce the guideline based on disapproval of expressive activities in general or the content of expressive activities in particular.

Similarly, the legislative history on which defendants rely, including a statement by Senator Courtney while the vigil was ongoing about "the situation out on the steps," is, at best, ambiguous, particularly given the concerns voiced regarding consistent enforcement. Moreover, although the Legislative Administrator testified that he raised the capitol steps policy at the November LAC meeting because of Darr's vigil, he also explained that he sought clarification of the policy at that meeting because he was the new Legislative Administrator—appointed from interim to permanent Legislative Administrator at the November meeting—trying to understand the guideline that he was charged with implementing. There is no indication that the LAC amended the guideline to target speech and expression.

to determine if "the terms of [the] law exceed constitutional boundaries, purporting to reach conduct protected by guarantees such as * * * [A]rticle I, section 8." *Id.* at 410. If a statute is overbroad, the court then must determine whether it can be interpreted to avoid such overbreadth. *Id.* at 412.

Similarly to their argument under the first category of *Robertson*, defendants do not argue that the text of the guideline includes expression as an element or "proscribed means" of causing targeted harm. Defendants instead argue that, even if the guideline targets some harm—rather than targeting expression—the guideline has an "obvious and foreseeable" application to speech, and it is overbroad. That is, defendants argue that the text of the statute does not have to refer to expression or include expression as an element to fall under category two, as long as it has an obvious application to expression. As with their argument regarding category one, defendants seek a more expansive inquiry than *Robertson* directs, and their argument similarly is not well taken.

The Court of Appeals' focus on the text of the guideline in its second category analysis echoes *Robertson*'s emphasis on the text. *See Babson*, 249 Or App at 286-87 (concluding that guideline does not fall into second category because it does not "expressly" provide that expression is a way to cause a regulated harm). In *Robertson*, this court discussed a second category challenge in terms of whether expression was a statutory element, or was the "proscribed means" of causing some harm. The court's analysis in *Robertson* focused squarely on the text of the law.[6] There, the court determined that the

---

[6] In a footnote, the court in *Robertson* briefly suggested that legislative history might support a category two challenge if that history showed that the "intended or expected object of the law" was suppression of expression. 293 Or at 417, 417 n 11 (noting that a law directed only at forbidden effects could not be challenged under category one or category two, "[n]ot, at least, without the support of legislative or other background showing that suppression of expression itself was the intended or expected object of the law"). In *Robertson*, however, speech was a statutory element of the statute at issue, so the court's reference to legislative history and the "intended or expected object of the law" was made in passing, and without elaboration.

This court has since called into question the meaning of that footnote from *Robertson*. In *State v. Illig-Renn*, 199 Or App 124, 127-28, 110 P3d 137 (2005), the Court of Appeals stated that that footnote from *Robertson* indicated that a facial challenge could be maintained, even if a statute was "speech neutral." On review,

coercion statute at issue was "directed in terms against the pursuit of a forbidden effect." *Robertson*, 293 Or at 415; *see also id.* at 417 (explaining that forbidden effect was "frightening another person into a nonobligatory and undesired course of conduct"). Nonetheless, the court analyzed the statute for overbreadth because "speech [was] a statutory element." *Id.* at 415-16 (noting that the statutory element of making a "demand" would require "a communication in words or otherwise" and that the statutory element of "instilling * * * fear" likely would involve "speech or its equivalent"). The court did not have to look beyond the text of the statute—either to the statute's "obvious application" or to context and legislative history—to determine that the statute should be analyzed for overbreadth under category two.

Despite *Robertson*'s explicit emphasis on the text of a statute under category two, defendants point to a passage from that case where, they argue, the court indicated that the inquiry under Article I, section 8, is not so limited. In explaining why the court could not narrow the overbroad coercion statute by judicial interpretation, the court in *Robertson* stated that "[i]t is, therefore, in the first instance a legislative responsibility to narrow and clarify the coverage of a statute so as to eliminate most *apparent applications* to free speech or writing, leaving only *marginal and unforeseeable* instances of unconstitutional applications to judicial exclusion." *Id.* at 436-37 (emphasis added). Based on that statement, defendants contend that the second category of *Robertson* applies to laws with obvious or "apparent" applications to speech, while laws with "marginal and unforeseeable" applications to speech are reserved for the third category of analysis.

Defendants' argument assumes, however, that the court's statement in *Robertson* about the legislature eliminating apparent applications to free expression applies to *all*

---

this court rejected that interpretation, stating that "our prior cases *do* foreclose the possibility of a facial challenge under Article I, section 8, to a 'speech-neutral' statute." *State v. Illig-Renn*, 341 Or 228, 234, 142 P3d 62 (2006) (emphasis in original); *see also id.* at 233 (noting that the Court of Appeals used the phrase "speech neutral" to mean "statutes that do not by their terms forbid particular forms of expression"). Thus, as we recently have emphasized, the footnote from *Robertson* does not take the focus away from the text of the law under the second category of *Robertson*.

laws, regardless of whether those laws refer to expression. That is, according to defendants, if it is "apparent" that a law could be applied to speech, it must be examined for overbreadth; even if the legislature is not required to eliminate "every imaginable application" to expression, defendants argue, it must eliminate apparent applications to expression. The state responds that defendants' approach would expand the reach of Article I, section 8, beyond what this court's case law supports.

We agree with the state that the statement in *Robertson* on which defendants rely does not extend Article I, section 8, overbreadth analysis to every law that the legislature enacts. When expression is a proscribed means of causing the harm prohibited in a statute, it is apparent that the law will restrict expression in some way because expression is an element of the law. For that type of law, the legislature must narrow the law to eliminate apparent applications to *protected* expression. *See Robertson*, 293 Or at 417-18 (noting that when a law focused on harmful effects includes expression as a proscribed means of causing those effects, the court must determine whether the law "appears to reach *privileged* communication" (emphasis added)). However, if expression is not a proscribed means of causing harm, and is not described in the terms of the statute, the possible or plausible application of the statute to protected expression is less apparent. That is, in the former situation, every time the statute is enforced, expression will be implicated, leading to the possibility that the law will be considered overbroad; in the latter situation, the statute may never be enforced in a way that implicates expression, even if it is possible, or even apparent, that it *could* be applied to reach protected expression. When a law does not expressly or obviously refer to expression, the legislature is not required to consider all apparent applications of that law to protected expression and narrow the law to eliminate them. The court's statement in *Robertson*, on which defendants rely, does not extend the second category overbreadth analysis to statutes that do not, by their terms, expressly or obviously refer to protected expression.

Nonetheless, since *Robertson*, we have recognized that the focus in a second category overbreadth challenge on

expression being an element of the law is not unyielding if there is a "clear case" of overbreadth. *See State v. Illig-Renn*, 341 Or 228, 235, 142 P3d 62 (2006) (so stating). In *Illig-Renn*, the defendant challenged as overbroad a statute that made it a crime to "[r]efuse[] to obey a lawful order by [a] peace officer" if the person knew that the person giving the order was a peace officer. ORS 162.247(1)(b) (1999), *amended by* Or Laws 2005, ch 668, § 1. In addressing the state's argument that the statute was not subject to an overbreadth challenge because it did not "expressly" restrict expression, this court stated that a statute is subject to a facial challenge—under the first or second category of *Robertson*—if it "expressly or obviously proscribes expression," leaving statutes with "[m]arginal and unforeseen applications to speech and expression" to as-applied challenges under the third category. *Illig-Renn*, 341 Or at 234. The court went on to clarify that it would not ignore a "clear case of facial unconstitutionality or overbreadth merely because the statute manages to avoid any direct reference to speech or expression." *Id.* at 235. Nonetheless, the court stated, facial challenges generally would not be permitted "if the statute's application to protected speech [was] not traceable to the statute's express terms." *Id.* at 236. Based on that interpretation of Article I, section 8, the court concluded that the defendant could challenge the statute that prohibited interfering with a peace officer only as applied, under the third category of *Robertson*, and not on its face, under the other two categories. *Id.* at 237.

Despite the court's apparent conclusion that the statute at issue in *Illig-Renn* did not "obviously" proscribe expression, the court did provide an example of a statute that would "obviously" proscribe expression. After stating that the court would not ignore a clear case of facial unconstitutionality or overbreadth merely because a statute avoided directly referring to expression, the court cited *State v. Moyle*, 299 Or 691, 705 P2d 740 (1985). *Illig-Renn*, 341 Or at 235-36. Specifically, the court quoted the portion of *Moyle* that explained that lawmakers could not evade the protections of Article I, section 8, "'simply by phrasing statutes so as to prohibit "causing another person to see" or "to hear" whatever [speech or expression] the lawmakers wish

to suppress.'" *Illig-Renn*, 341 Or at 235-36 (quoting *Moyle*, 299 Or at 699) (alteration in *Illig-Renn*). *Moyle* provides useful context for understanding what the court in *Illig-Renn* meant when it referred to statutes that "obviously" proscribe expression.

In *Moyle*, this court addressed the constitutionality of a harassment statute that prohibited alarming another person by conveying a telephonic or written threat to inflict serious physical injury or commit a felony. 299 Or at 693. The court determined that the focus of the statute was preventing harm, and expression was one way of causing that harm. *Id.* at 699. The court explained, however, that even a law written in terms that target harm, rather than expression, could violate Article I, section 8: "The constitutional prohibition against laws restraining speech or writing cannot be evaded simply by phrasing statutes so as to prohibit 'causing another person to see' or 'to hear' whatever the lawmakers wish to suppress." *Id.* The court went on to note that a difficulty arises when, for example, a crime is defined "in terms of causing a kind of harm which necessarily results only from speech or writing, so that the statutory definition is only the other side of the coin of a prohibition of the speech or writing itself." *Id. Moyle* recognized that lawmakers could not avoid the protections of Article I, section 8, by phrasing a law to target harm that essentially mirrors protected expression. *See id.* at 701 ("In short, ORS 166.065(1)(d) does not run afoul of Article I, section 8, for the reason that the effect that it proscribes, causing fear of injury to persons or property, merely mirrors a prohibition of words themselves. The statute, however, prohibits causing this effect specifically by words.") The harassment statute in *Moyle*, however, did not "obviously" proscribe speech by "mirror[ing] a prohibition of words themselves," and the court instead examined the statute for overbreadth because verbal threats were a central element of the crime. *Id.* at 701-02. The court concluded that it could narrow the statute by judicial interpretation and did not invalidate the statute as overbroad. *Id.* at 705.

When *Illig-Renn* quoted *Moyle* in its discussion of a statute that would "obviously" proscribe speech without

directly referring to it, the court indicated that it would extend Article I, section 8, scrutiny under the first two *Robertson* categories to statutes that "mirror[] a prohibition of words," even if they do not expressly mention expression. The court did not use the word "obviously" to extend Article I, section 8, scrutiny to any statute that could have an apparent application to speech; rather, the court used the word "obviously" to make it clear that creative wording that does not refer directly to expression, but which could *only* be applied to expression, would be scrutinized under the first two categories of *Robertson*.

The outcome in *Illig-Renn* is consistent with *Moyle*. As noted, in *Illig-Renn*, the court examined the constitutionality of a statute that prohibited interfering with a peace officer. The text of the statute did not directly refer to speech, but the statute did have an apparent application to speech. *See State v. Illig-Renn*, 196 Or App 765, 769-70, 103 P3d 1178 (2004), *adh'd to as modified on recons*, 199 Or App 124, 110 P3d 137 (2005), *rev'd*, 341 Or 228, 142 P3d 62 (2006) (noting that statute at issue in *Illig-Renn* covered nearly all protected conduct covered by statute held to be overbroad in *Ausmus*). The statute also could be applied to more than speech, however, and therefore was not a mirror of a prohibition on words. Accordingly, in *Illig-Renn*, this court concluded that the statute could not be examined under the first two categories of *Robertson* because it did not expressly or obviously restrain expression. *See* 341 Or at 236-37.

Similarly, here, although the guideline does not directly refer to speech, the guideline does have apparent applications to speech, as defendants contend. A restriction on use of the capitol steps will prevent people like defendants from protesting or otherwise engaging in expressive activities on the capitol steps overnight. That fact alone, however, does not subject the guideline to Article I, section 8, scrutiny under the second category of *Robertson*. The guideline is not simply a mirror of a prohibition on words. The guideline also bars skateboarding, sitting, sleeping, walking, storing equipment, and all other possible uses of the capitol steps during certain hours. Thus, because the guideline does not expressly refer to expression as a means of causing some harm, and

it does not "obviously" prohibit expression within the meaning of *Moyle*, it is not subject to an overbreadth challenge under the second category of *Robertson*.

## C. Robertson *Category Three*

*Robertson* established that if a statute is "directed only against causing * * * forbidden effects," a person charged with violating that statute by means of expression can bring a constitutional challenge under Article I, section 8, by arguing that the statute "could not constitutionally be applied to his [or her] particular words or other expression." 293 Or at 417. Because the court in *Robertson* determined that the statute at issue was unconstitutionally overbroad, the court did not further elaborate on the proper analysis for an as-applied challenge. *See id.* at 435-36 (concluding that law at issue was overbroad and not subject to judicial narrowing). Since *Robertson*, this court has resolved most Article I, section 8, cases through facial challenges under the first two categories of the *Robertson* framework, leaving analysis under the third category largely undeveloped.

Defendants assert that the as-applied analysis must examine whether the state enforced the guideline against them because of their expression. They argue that testimony from the Legislative Administrator about any discussions that he had with LAC members about enforcement of the guideline, as well as testimony from the LAC co-chairs, could help prove that enforcement of the guideline was directed at suppressing defendants' expression. In response, the state does not expressly disagree that the third category analysis involves an inquiry into whether enforcement was directed at suppressing defendants' expression. The state argues, however, that the trial court properly determined that the guideline was enforced because of defendants' conduct of trespassing on the capitol steps, rather than because of defendants' protected speech. To the extent that this court addresses the testimony that defendants seek, the state argues, defendants cannot challenge the trial court's exclusion of that testimony because there are procedural obstacles. In particular, the state argues, defendants did not make the necessary offer of proof for the Legislative Administrator's testimony and failed to show that the legislators' testimony would be

material and favorable to their case. Alternatively, the state argues that the Debate Clause of the Oregon Constitution prevents defendants from calling the legislator co-chairs of the LAC into court to testify about enforcement of the guideline to support their as-applied challenge.

This court's most detailed as-applied analysis under Article I, section 8, was in *City of Eugene v. Miller*, 318 Or 480, 871 P2d 454 (1994). In *Miller*, the defendant challenged an ordinance that prohibited vendors from selling merchandise on city sidewalks, unless those vendors had a license to sell food, beverages, flowers, or balloons. *Id.* at 482-83. The defendant was convicted of violating that ordinance after he sold joke books on the sidewalk. In analyzing the ordinance, this court first concluded that it was valid under the first category of *Robertson* because it banned the sale of all expressive material on the sidewalk and therefore was content neutral.[7] *Id.* at 489. The court also held that the ordinance did not fit within the second category of *Robertson* because it was directed at a harm—street and sidewalk congestion—that the city legitimately could seek to prevent, and did not, "by [its] terms, purport to proscribe speech or writing as a means to avoid a forbidden effect." *Id.* at 489-90.

The court in *Miller* nonetheless held that the ordinance was invalid under Article I, section 8, as applied to the defendant's conduct. *Id.* at 490. In reaching that conclusion, the court stated that "[w]hen a law is challenged 'as applied' under the third *Robertson* category, the question is whether the law was applied so that it did, in fact, reach privileged communication." *Id.* Specifically, the court framed the inquiry in that case as whether applying the ordinance to the defendant's sale of joke books "impermissibly burden[ed] his right of free speech." *Id.* The court determined that the law had been applied to impermissibly burden the defendant's expression because it treated the defendant's sale of

---

[7] Content neutrality is not necessarily the end of the analysis in every case. As the court in *Miller* made clear, although "expressive material is not exempt from *all* 'content-neutral' regulation," that does not mean that expressive material "may be subjected to *any* 'content-neutral' regulation." *Miller*, 318 Or at 486-87 (emphasis in original). As an example, the court in *Miller* suggested that a ban on the sale and distribution of all expressive material within city limits likely would violate Article I, section 8, because "it would restrict too greatly" the right of free expression. *Id.* at 487.

expressive material "more restrictively" than it treated the sale of certain other merchandise, and there was no "rational basis" or "reasonabl[e] justif[ication]" for treating the defendant differently. *Id.* at 491-92. The court left open the question of whether the city could ban all sidewalk vending or whether the city could limit sidewalk vending to goods for which there was a special public need. *Id.* at 491.

*Miller* arose in a different context than this case does. In *Miller*, the court's conclusion was based on differences in enforcement required by the text of the ordinance, rather than potential differences in enforcement based on the decisions of the government actors enforcing the law. Despite the more restrictive treatment of the defendant in *Miller*, there was no indication that the city was targeting expressive activity in general or the content of the defendant's expression in particular in the way that it *enforced* an otherwise content-neutral ordinance. In contrast, here, defendants argue that the state enforced the guideline against them because of their speech.

Although *Miller* arose in a different context, its general premise applies equally here: a law is invalid as applied to particular expression if "it did, in fact, reach privileged communication," and enforcement of the law against a particular defendant "impermissibly burden[ed] his [or her] right of free speech." *Id.* at 490. Here, the state does not dispute that enforcement of the guideline against defendants reached—and burdened—their expressive activities. This court, however, has acknowledged that some burdens on expressive activities are permissible, such as time, place, and manner restrictions. *See, e.g., Outdoor Media Dimensions v. Dept. of Transportation*, 340 Or 275, 289-90, 132 P3d 5 (2006) (noting that "Article I, section 8, does not bar every content-neutral regulation of the time, place, and manner of speech"); *see also State v. Henry*, 302 Or 510, 525, 732 P2d 9 (1987) (noting that the court would "not rule out * * * reasonable time, place and manner regulations of the nuisance aspect of [sexually explicit material]"); *Tidyman*, 306 Or at 182 (noting that "structures and activities unquestionably devoted to constitutionally privileged purposes such as religion or free expression are not immune from regulations imposed for reasons other than the substance of their

particular message"). Accordingly, the inquiry is not simply whether defendants' expression was burdened, but whether the burden on defendants' expression was *impermissible.* *See Ausmus,* 336 Or at 505 (recognizing that the protection of speech under the Oregon Constitution "is not absolute"). We therefore must consider whether the restriction on defendants' expression arising from enforcement of the guideline was impermissible, or whether it was a permissible restriction on the time, place, and manner of their expression.

This court described a general framework for time, place, and manner analysis in *Outdoor Media,* 340 Or 275. In *Outdoor Media,* the state cited the petitioner for displaying outdoor advertising signs without the statutorily required permit. *Id.* at 279. On review, the petitioner challenged the citations under Article I, section 8, and this court invalidated one part of the statutory scheme, which regulated on-premises and off-premises signs differently, because the court determined that the distinction was content based. *Id.* at 299. The court also determined, however, that other parts of the statutory scheme were permissible because they were content-neutral restrictions on only the time, place, and manner of expression. *Id.* at 292. The court considered three factors in determining whether restrictions within the statutory scheme were reasonable limits on the time, place, and manner of expression: (1) whether the law "discriminate[d] on the basis of the subject or content of speech" or "effectively *prohibited* certain forms of speech" while allowing nonexpressive conduct, *id.* at 290-91 (emphasis in original); (2) whether the restriction advanced a legitimate state interest without restricting substantially more speech than necessary, *id.* at 280-81, 291-92, 296 (limiting permits to the number of signs that existed in 1975 "was intended to, and [did]" limit number of signs visible from public highways to further "legitimate safety and aesthetic goals," but prohibiting all billboards might be viewed differently); and (3) whether there were "ample avenues to communicate" the individual's message despite the law's restrictions, *id.* at 292. The petitioner did not argue that the statutory provisions treated expressive activities more restrictively than nonexpressive activities, so the court did not consider that issue. Instead, the court determined that

most of the statutory provisions were content neutral, that they advanced the legitimate state interests identified in the statutory scheme, and that there were ample avenues for the petitioner to communicate its message. Thus, the court upheld most of the statutory provisions as content-neutral time, place, and manner restrictions under Article I, section 8. *Id.* at 290-92.

Although the court in *Outdoor Media* applied the time, place, and manner analysis under the second *Robertson* category, *id.* at 288, that analysis also can be applied under the third category of *Robertson*. Under the third category, the court must examine how the law was applied to determine whether the application was directed at the content or the expressive nature of an individual's activities, advanced legitimate state interests, and provided ample alternative opportunities to communicate the intended message.

We now consider whether enforcement of the guideline against defendants was a reasonable time, place, and manner restriction on defendants' speech, or whether it was an impermissible restriction on privileged expression. We first consider whether the enforcement of the guideline advanced a legitimate government interest without restricting substantially more speech than was necessary. Here, we conclude that the enforcement advanced legitimate government interests in safety, security, and aesthetics. Before trial, the Legislative Administrator explained in an affidavit that his concerns with the vigil were "building security," including risk to the building from fires, "the security of the individuals" on the steps, "cleanliness and litter," and individuals sleeping on the steps.

The officers who cited defendants testified that they cited defendants because they were trespassing by being present on the steps overnight. Citing defendants for overnight use of the capitol steps advanced the legitimate objectives identified by the Legislative Administrator by discouraging continuous presence on the steps. The citations likewise advanced the LAC guidelines' objective of "maintaining the Capitol's historical integrity and dignity." *See Clark v. Community for Creative Non-Violence*, 468 US 288, 296, 104 S Ct 3065, 82 L Ed 2d 221 (1984) (concluding that

regulation prohibiting camping on park lands outside of designated campgrounds narrowly focused on substantial government interest in "maintaining the parks in the heart of our Capital in an attractive and intact condition, readily available to the millions of people who wish to see and enjoy them by their presence").

Even when government is seeking to advance a legitimate interest, it may not restrict substantially more speech than necessary to advance that interest. In *Outdoor Media*, for example, this court indicated that it might view differently a complete prohibition on billboards, rather than a restriction on the number of billboards. 340 Or at 291-92 ("If the state were to prohibit billboards—or some other form of expression—entirely, then perhaps there would be reason to consider whether the effect of such a ban 'restrain[ed] the free expression of opinion' or 'restrict[ed] the right to speak, write, or print freely' under Article I, section 8." (Alteration in *Outdoor Media*.)). In fact, this court did invalidate an ordinance that "prohibit[ed] all solicitation for any purpose at any time" in *Purcell*. 306 Or at 556. There, the court noted that the city likely could "place reasonable limitations on door-to-door solicitations." *Id.* The court concluded, however, that the ordinance prohibiting solicitation was "far more than a regulation limited to and contained by the consequences the law [sought] to prevent." *Id.*

Similarly, when a law is *enforced* in a way that restricts "far more" speech than is necessary to advance the government interest, that enforcement is not a reasonable restriction on the time, place, and manner of expression. Here, enforcement of the guideline prevented defendants from using the steps for eight hours each night. Although the guideline restricted the location of defendants' expression during those hours, it did not prohibit that expression from occurring all together. Defendants could protest on the capitol steps 16 hours a day, and there is no indication that defendants were prevented from effectively conveying their message from another location during the eight nighttime hours (or from the capitol steps during those hours when legislative hearings or floor sessions were being held). *See Service Employee Intern. Union v. Los Angeles*, 114 F Supp 2d

966, 971-72 (CD Cal 2000) (invalidating restriction requiring protesters to use "demonstration site" 260 yards away from site of Democratic National Convention because restriction was in place 24 hours a day and covered more area than necessary). We therefore conclude that the guideline advanced the government's legitimate interests without restricting substantially more speech than necessary. [8]

Second, we consider whether there were ample alternative avenues for defendants to communicate their message, and we conclude that there were. As noted, they could communicate their message on the capitol steps for 16 hours per day—the hours when the intended recipients of their message were most likely to be present—and overnight when legislative hearings or floor sessions were being held. Moreover, as explained above, there is no indication in the record that the capitol steps were the only place where defendants could effectively communicate their message during the other eight hours. Defendants' testimony that the location of the protest on the capitol steps was important to their message is not dispositive in this case because there is no indication that they were unable to effectively communicate their message at or near that location at all times. *Cf. Outdoor Media*, 340 Or at 291-92 (acknowledging that certain means of communicating, such as outdoor advertising signs, might have characteristics that make them "uniquely suited to conveying certain messages to certain audiences," but nonetheless upholding restrictions on the number of signs permitted). We conclude that, although the location of defendants' protest was important to them, enforcement of the guideline did not leave defendants without ample alternative locations to effectively communicate

---

[8] As defendants note, at least some of the Legislative Administrator's concerns could have been addressed under other provisions of the LAC guidelines. His concern about cleanliness, for example, arguably could have been addressed under the guideline requiring users to leave the steps in "a neat and clean condition"; his concern about the security of the building and defendants could have been addressed under the guideline requiring users to "comply with the laws regarding public access and safety." The requirement that the enforcement advance a legitimate government interest, however, does not require the government to regulate defendants only on the narrowest ground possible. *Cf. Tidyman*, 306 Or at 189 (noting that neutral regulation to limit traffic and noise by excluding retail business from residential area may be applied to businesses that generate little noise).

their message during the eight hours each night when the capitol steps were closed.

The final inquiry is whether the guideline was enforced against defendants because of their expression. Defendants first argue that the state's failure to enforce the guideline against others who used the capitol steps between 11:00 p.m. and 7:00 a.m. demonstrates that they were targeted because of the content of their expression or because they were engaged in expression. In particular, defendants argue that "[n]o one seemed concerned about overnight presence on the Capitol steps while the Bible was being read or basketball was being played," referring to a group that previously had been authorized to use the capitol steps for a 24-hour Bible reading marathon and a group that had stored basketball equipment on the capitol steps overnight. Both groups, however, were allowed to use the steps overnight only before the new Legislative Administrator was appointed and when the Legislative Administrator had discretion to allow overnight use of the steps. The citations at issue in this case took place *after* the guideline was amended to remove that discretion, and, on this record, defendants were the only individuals who violated the guideline following the guideline's amendment in January 2009. In addition, the Legislative Administrator warned other groups that the guideline barred overnight use of the steps, indicating that the guideline would have been consistently enforced had others tried to violate it. Therefore, defendants failed to show that the guideline was enforced against them, and not against others using the capitol steps overnight, after the LAC amended the guideline.

Defendants nonetheless assert that the enforcement of the guideline against them was directed at suppression of their speech in general or the content of their speech in particular. The trial court rejected that argument. Before the Court of Appeals, defendants argued that the trial court had improperly excluded two additional pieces of testimony that could have supported that argument: "the testimony of Burgess, the LAC administrator, regarding whether he was instructed to enforce the rule based on the content of defendants' protest, and the testimony of the LAC co-chairs regarding whether they ever instructed Burgess, the state

police, or anybody else to that effect." *Babson*, 249 Or App at 291. The Court of Appeals affirmed the trial court's ruling excluding that aspect of the Legislative Administrator's testimony because defendants had failed to make an offer of proof, *id.* at 292, but the Court of Appeals remanded the case to allow defendants to question the legislator co-chairs of the LAC about "any instructions or other communications that they might have given to or had with the LAC administrator or others regarding *enforcement* (as opposed to *enactment*) of the overnight rule." *Id.* at 302, 308 (emphasis in original).

On review, defendants argue that the Court of Appeals erred in affirming the exclusion of that portion of the Legislative Administrator's testimony, and the state argues that the Court of Appeals erred in remanding the case for defendants to question the LAC co-chairs. Because that evidence could demonstrate that enforcement of the guideline against defendants was impermissibly directed at their expression, we address each of those pieces of testimony in turn to determine whether the case must be remanded for additional testimony to support defendants' as-applied challenge. If the testimony should not have been excluded, we must determine whether "there was little likelihood that the erroneous exclusion" of the evidence affected the outcome. *See State v. Davis*, 336 Or 19, 32, 77 P3d 1111 (2003).

1. *The Legislative Administrator's Testimony*

Generally, when a trial court excludes testimony, a party must make an offer of proof if the party later wants to assign error to that ruling. *See* OEC 103(1)(b) (explaining that a party can assign error to a ruling excluding evidence if "the substance of the evidence was made known to the court by offer or was apparent from the context within which questions were asked"). This court has explained that one rationale behind that rule is that it "assure[s] that appellate courts are able to determine whether it was error to exclude the evidence and whether any error was likely to have affected the result of the case." *State v. Affeld*, 307 Or 125, 128, 764 P2d 220 (1988). More importantly for purposes of this case, a second rationale is that the rule "assure[s]"

that the trial court can make an informed decision." *State v. Olmstead*, 310 Or 455, 461, 800 P2d 277 (1990). That is, "An offer of proof permits the parties to raise additional arguments, if appropriate, and gives the court an opportunity to reconsider its ruling and correct any error." *Id.* The rule does not apply when an offer of proof is "impossible because of a trial court's refusal to allow the offer of proof to be made." *Affeld*, 307 Or at 129.

In this case, the Legislative Administrator testified that he probably spoke with Senator Courtney and Representative Gelser regarding their concerns about people being on the steps for 24 hours a day. Defense counsel then sought specifics, and asked the Legislative Administrator, "And what did Representative Gelser say to you about it?" The state objected on hearsay grounds, and the court sustained the objection. Defense counsel argued that the testimony was "not offered to prove the truth," but the trial court stood by its ruling. Defense counsel proceeded to ask the Legislative Administrator the same question about any discussions that he had had with Senator Courtney. The state again objected, and the trial court again sustained the objection. At that point, defense counsel pursued another line of questioning, without making an offer of proof.

The state argues that this court cannot review defendants' claim that the trial court improperly excluded the Legislative Administrator's testimony about conversations with legislators because defendants did not make an offer of proof regarding that testimony. Defendants respond that any offer of proof would have been futile because of the trial court's earlier ruling on a separate offer of proof. Specifically, defendants point to defense counsel's earlier questioning of an Oregon State Police officer, during which defense counsel had asked, "You said there was a lot of talk up to that date [of the citations]; what were you referring to?" The trial court sustained a hearsay objection to that question. Defense counsel then proceeded to make an offer of proof by questioning the officer:

"Q.  * * * [P]lease tell me everyone you talked to about the presence of these Defendants on the steps. * * * Name them.

"* * * * *

"A. Sergeant Lorimor. * * * Senior Trooper Arnautov, who's here today. Recruit Henshell. Probably just about— well, I know for a fact that those were involved—that I talked [to] them. Anybody else I'm not 100-percent positive.

"Q. Now, did any of them tell you why someone wanted these Defendants to be off the steps?

"A. No. Just that that was a safety—that somebody shouldn't be on there from 11:00 p. to 7 a.

"Q. Who told you that?

"A. It was during conversation. I don't remember the—

"Q. Let's take our time. Who told you—

"THE COURT: That's why hearsay's objectionable. And I'm going to sustain it. We're not going to keep going with an offer of proof that's going to get into things that are very, very clearly hearsay."

We disagree with defendants' assertion that that colloquy demonstrates that an offer of proof regarding what legislators told *the Legislative Administrator* would have been futile. The trial court's decision to end the earlier offer of proof does not demonstrate that the trial court would not have allowed any later offer of proof on a similar subject. As noted, one purpose behind the offer of proof requirement is that it "gives the [trial] court an opportunity to reconsider its ruling and correct any error." *Olmstead*, 310 Or at 461. To the extent that an offer of proof about what legislative leaders told the Legislative Administrator would have been similar to the prior offer of proof about what various state police officers told another state police officer, it would have provided the court with an opportunity to reconsider its prior ruling and "correct any error." Moreover, the offer of proof would have allowed defendants to demonstrate that the proffered testimony did not qualify as hearsay, as defense counsel clearly indicated was his view. As the record stands, however, we cannot determine whether the Legislative Administrator's testimony would have qualified as hearsay or whether the exclusion of that testimony was prejudicial. Thus, because there was no offer of proof, we do not consider the merits of defendants' challenge to the

exclusion of that portion of the Legislative Administrator's testimony.

### 2. *The LAC Co-Chairs' Testimony*

As noted, the other testimony that the trial court excluded was that of the legislator co-chairs of the LAC, Senator Courtney and Representative Hunt. Before trial, defendants subpoenaed the legislator co-chairs of the LAC, but the state filed a motion to quash those subpoenas. The state argued, among other things, that Article IV, section 9, of the Oregon Constitution, the Debate Clause, prevented the court from compelling the legislators to testify, and that defendants had not shown that the legislators' testimony would be material and favorable to defendants' case. The trial court granted the motion to quash, but told defense counsel that, at the conclusion of the first day of trial, the court would "invite [counsel] to tell me why at the conclusion of our evidence today you feel that you have not been able to put on your full case * * * and I'll make a determination at that point whether or not it becomes critical for the subpoenas to be reinstated."

At the start of the second day of trial, after the Legislative Administrator had given some of his testimony, defendants requested that the court direct one of the legislator co-chairs to appear in person to testify. The court stated, "I am not prepared based on the evidence heard this far to require Senator Courtney to personally appear." At the end of a lengthy discussion with the parties about the Debate Clause, the court stated, "[T]he order to quash stands. I'm not even going to call Senator Courtney. We'll just assume that he was going to assert a privilege * * *." At that point, defendants requested to make an offer of proof, and the court told them that they could make an offer of proof in the form of a list of questions that would have been asked. Defendants submitted their offer of proof following trial.

On review, the state challenges the Court of Appeals' ruling reversing the trial court and allowing defendants to question the legislator co-chairs of the LAC about enforcement of the guideline. *See Babson*, 249 Or App at 302, 308 ("[D]efendants were entitled to question the legislators, but

only about any instructions or other communications that they might have given to or had with the LAC administrator or others regarding *enforcement* (as opposed to *enactment*) of the overnight rule." (Emphasis in original.)). The state argues that Article IV, section 9, protects legislators from being compelled to testify or defend lawsuits involving their internal communications and deliberations. In this case, the state argues, any communication between legislator members of the LAC and the Legislative Administrator about enforcement of the guideline was a continuation of internal deliberations of the LAC, which would be protected under Article IV, section 9. Alternatively, the state argues that we need not reach the merits of its Article IV, section 9, argument because defendants failed to make an adequate offer of proof demonstrating that the testimony of the subpoenaed legislators would be material and favorable to their case. *Amicus curiae* Oregon Legislative Assembly filed a brief in support of the state's arguments.

We reject the state's argument that defendants failed to make an adequate offer of proof. Although defendants' failure to make an offer of proof during the Legislative Administrator's testimony prevents us from determining whether that testimony properly was excluded, it does not affect our determination as to the LAC co-chairs' testimony. Regardless of what the Legislative Administrator might have said about conversations with legislators during an offer of proof, defendants would not be required to accept that testimony, because the LAC co-chairs could offer contradictory testimony. Moreover, defendants were not able to question the LAC co-chairs for purposes of making an offer of proof because the trial court declined to allow defendants to depose or otherwise obtain testimony from the co-chairs, instead deciding to "assume" that they would assert a privilege. When defendants asked to make an offer of proof, the trial court stated, "I don't know how you'd be able to do that without [Senator Courtney] here." Because defendants were not able to question the LAC co-chairs, their failure to make an offer of proof does not preclude our review. *Cf. Olmstead*, 310 Or at 461 ("When the trial court excludes an entire class of evidence by declaring, in advance, that it is inadmissible as a matter of law, the ruling renders a further

offer futile."). Thus, we proceed to consider the state's argument under Article IV, section 9, of the Oregon Constitution.

Article IV, section 9, of the Oregon Constitution provides,

> "Senators and Representatives in all cases, except for treason, felony, or breaches of the peace, shall be privileged from arrest during the session of the Legislative Assembly, and in going to and returning from the same; and shall not be subject to any civil process during the session of the Legislative Assembly, nor during the fifteen days next before the commencement thereof: Nor shall a member for words uttered in debate in either house, be questioned in any other place."

This court has never interpreted that provision, so our analysis focuses on the text and on the history surrounding enactment of that provision. *See Priest v. Pearce*, 314 Or 411, 415-16, 840 P2d 65 (1992) (interpreting original provisions of the Oregon Constitution involves analyzing text of provision, history surrounding its enactment, and case law). In undertaking that analysis, our goal is to "determine the meaning of the constitutional wording, informed by general principles that the framers would have understood were being advanced by the adoption of the constitution." *State v. Mills*, 354 Or 350, 354, 312 P3d 515 (2013).

a.    Text and Context of Article IV, Section 9

The only clause of Article IV, section 9, at issue on review states, "Nor shall a member for words uttered in debate in either house, be questioned in any other place." Although "words uttered in debate" could include a variety of communications, both spoken and written, the text narrows the clause's protection to "words uttered in debate *in either house.*" Or Const, Art IV, § 9 (emphasis added); *see* Noah Webster, 2 *An American Dictionary of the English Language* (unpaginated) (1828) (defining "word" to include "[a]n articulate or vocal sound *** uttered by the human voice" and "[t]he letter or letters, written or printed, which represent a sound or combination of sounds"); *id.* (defining "uttered" as "[s]poken; pronounced; disclosed; published; put into circulation"); Webster, 1 *An American Dictionary of*

*the English Language* (unpaginated) (defining noun "debate" as "[c]ontention in words or arguments; discussion for elucidating truth; strife in argument or reasoning, between persons of different opinions, each endeavoring to prove his own opinion right, and that of his opposer wrong; dispute; controversy"). The text "in either house" could confine the privilege to communications that occur in a particular place, but an examination of the word "house," in context, reveals a different focus.

Definitions of the word "house" from around the time that the Oregon Constitution was adopted suggest a figurative use for the term, referring to the legislature as an institution. *See* Webster, 1 *An American Dictionary of the English Language* (unpaginated) (defining "house," as relevant here, as "a body of men united in their legislative capacity, and holding their place by right or by election" and noting that, in "most of the United States, the legislatures consist of two *houses*, the senate, and the house of representatives or delegates" (emphasis in original)); John Bouvier, 1 *A Law Dictionary* 471 (1839) ("House is used figuratively to signify a collection of persons as the house of representatives[.]"). Other provisions of the Oregon Constitution also use the word "house" to refer to the legislature as an institution. *See, e.g.,* Or Const, Art IV, § 11 ("Each house when assembled, shall choose its own officers, judge of the election, qualifications, and returns of its own members * * * but neither house shall without the concurrence of the other, adjourn for more than three days, nor to any other place than that in which it may be sitting."); Or Const, Art IV, § 14 ("The deliberations of each house, of committees of each house or joint committees and of committees of the whole, shall be open."). When viewed in those terms, the Debate Clause applies to communications that occur when "a collection of persons," that is, legislators, are "united in their legislative capacity." In other words, the privilege applies when legislators are communicating in carrying out their legislative functions.

The other clauses of Article IV, section 9, support that interpretation because their protections apply when the legislature is in session—or shortly before or after the

session—and, thus, when legislators generally are engaging in legislative functions. The other clauses of Article IV, section 9, protect legislators from arrest "during the session of the Legislative Assembly, and in going to and returning from the same" and from civil process "during the session of the Legislative Assembly" and "during the fifteen days next before the commencement thereof." Or Const, Art IV, § 9. Although the protections of those clauses extend beyond the legislative session, they appear to do so only to the extent necessary to allow legislators to perform legislative functions, either by allowing them to come and go from the session without being impeded by arrest or by allowing them to avoid civil process right before they go to the session to perform their legislative role.[9]

In its focus on allowing legislators to carry out their legislative functions during a session of the Legislative Assembly, Article IV, section 9, when viewed as a whole, appears to serve two related purposes. The provision allows legislators to perform their legislative functions without being interrupted or distracted by arrest, civil process, or other questioning. It also allows legislators to perform their legislative functions without fear of retribution in the form of "be[ing] questioned in any other place" by either another branch of government or the public. In providing those protections, the Debate Clause preserves legislative integrity and independence. *See United States v. Johnson*, 383 US 169, 178, 86 S Ct 749, 15 L Ed 2d 681 (1966) (noting that the Speech or Debate Clause is "an important protection of the independence and integrity of the legislature").[10]

b. History Surrounding Adoption of Article IV, Section 9

Concerns about legislative independence were the foundation for the speech or debate clause that originated in England and that later was adopted in the colonies, in

---

[9] *Amicus* argues that the Debate Clause is not similarly temporally limited. We do not address that issue in this case because we resolve the parties' dispute on other grounds.

[10] Although federal cases decided after the Oregon Constitution was adopted are not controlling authority in our interpretation of Article IV, section 9, because of the similar wording and similar origins of the federal Speech or Debate Clause, federal cases provide a useful perspective.

the United States Constitution,[11] and in many states. *United States v. Brewster*, 408 US 501, 507-08, 92 S Ct 2531, 33 L Ed 2d 507 (1972) (noting that the English Speech or Debate Clause arose out of a struggle for parliamentary supremacy, and the American Speech or Debate Clause "was designed to preserve legislative independence"); *Tenney v. Brandhove*, 341 US 367, 372-75, 71 S Ct 783, 95 L Ed 1019 (1951) (describing history of federal Speech or Debate Clause, from its roots in the English Bill of Rights, to being "taken as a matter of course" in the colonies, to inclusion in the Articles of Confederation, in the United States Constitution, and in many state constitutions). Moreover, speech or debate clauses were incorporated into the federal constitution and state constitutions at a time when there were fears about legislative excess. *See Tenney*, 341 US at 375 ("It is significant that legislative freedom was so carefully protected by constitutional framers at a time when even Jefferson expressed fear of legislative excess."). The fact that speech or debate clauses generally were adopted at a time when there were concerns about the scope of legislative power suggests that the framers intended to preserve legislative independence while limiting the protections of the Debate Clause to communications associated with performing legislative functions.

We cannot say with certainty what prompted the Oregon framers to include the Debate Clause in the Oregon Constitution, however, because there was no reported debate about the clause at Oregon's constitutional convention. *See* Claudia Burton, *A Legislative History of the Oregon Constitution of 1857—Part II (Frame of Government: Articles III-VII)*, 39 Willamette L Rev 245, 286-87 (2003) (so stating). The historical record does reveal some modification of the clause, but without any recorded debate, we cannot draw much meaning from the record. For example, Matthew Deady proposed an amendment to add the words "provided such speech had been actually made during a session of said house," which may have been an attempt to narrow the clause to cover only spoken words. *Id.* at 286. That amendment was

---

[11] Article I, section 6, of the United States Constitution provides, in part, that "for any Speech or Debate in either House, [the Senators and Representatives] shall not be questioned in any other Place."

defeated without recorded debate, however, so there is no indication whether the framers intended a broader meaning or assumed that such an addition was unnecessary because it would be redundant. We similarly do not place much weight on the change made to the text as introduced, substituting "words uttered in debate" for "any speech or debate," because that change also was made without discussion or explanation. *Id.* at 287 (noting change and inferring that it likely "was intended simply as a linguistic improvement"); *see* Steven F. Huefner, *The Neglected Value of the Legislative Privilege in State Legislatures*, 45 Wm & Mary L Rev 221, 239 (2003) (noting that textual differences in speech or debate clauses adopted in different states "appear to reflect stylistic adjustments in the phrasing of the privilege, more than substantive differences in the nature of the privilege"). Thus, the record of the Oregon constitutional convention adds little to the analysis.

Our review of the history is not so limited, however, because at the time that the Oregon Constitution was adopted, there was an "authoritative case" interpreting a similar clause in the Massachusetts Constitution, *Coffin v. Coffin*, 4 Mass 1 (1808). *See Kilbourn v. Thompson*, 103 US 168, 204, 26 L Ed 377 (1880) (describing *Coffin* as perhaps "the most authoritative case in this country on the construction of the provision in regard to freedom of debate in legislative bodies" and concluding that the case was "of much weight" because it was decided shortly after adoption of the federal constitution); *Yancy v. Shatzer*, 337 Or 345, 362, 97 P3d 1161 (2004) (discussing the "prevailing view throughout the American legal landscape in 1857" in interpreting a provision of the Oregon Constitution). In fact, *Coffin* appears to be the only case to have interpreted a speech or debate clause prior to adoption of the Oregon Constitution. *See* Huefner, 45 Wm & Mary L Rev at 233, 233 n 35 (noting that no other American cases discussing the legislative privilege existed by 1880, except cases discussing a common-law privilege for local government legislators).

In *Coffin*, the Massachusetts Supreme Judicial Court described that state's Speech and Debate Clause as having a broad scope, but the court concluded that the clause

did not protect the speech at issue in that case.[12] The case involved an action for slander against a state legislator for statements he made in the legislative chamber while the legislature was in session. Another legislator had moved for a resolution appointing an additional notary at the urging of the plaintiff, who was not a legislator but was present for the legislative session. *Coffin*, 4 Mass at 24. While the resolution was under consideration, the defendant asked the legislator where he had gotten the information on which the resolution was based, and the legislator answered, "from a respectable gentleman from Nantucket." *Id.* The speaker then took up other business, and the defendant approached the legislator in the chamber passageway to ask who the "respectable gentleman" was. When the legislator pointed to the plaintiff as the source of his information, the defendant said, "What, that convict?" *Id.* When told that the plaintiff had been acquitted of the crime to which the defendant was referring, the defendant stated, "That did not make him less guilty, thee knows." *Id.* at 25. In the subsequent slander trial, the jury found in the plaintiff's favor. *Id.* at 26.

In considering the defendant's claim that he was protected from prosecution by the Speech and Debate Clause, the Massachusetts Supreme Judicial Court began by explaining that the clause was intended to "support the rights of the people, by enabling their representatives to execute the functions of their office without fear of prosecutions, civil or criminal." *Id.* at 27. Given that purpose behind the clause, the court concluded that it should be construed liberally. *Id.* Along those lines, the court stated that it would not confine the scope of the clause to "delivering an opinion, uttering a speech, or haranguing in debate" and it instead "extend[ed] it to the giving of a vote, to the making of a written report, and to *every other act resulting from the nature, and in the execution, of the office*." *Id.* (emphasis added). Rather than limiting application of the clause to a particular type of communication or to "the walls of the representatives' chamber," the court construed the clause to extend to "the exercise of the

---

[12] The Speech and Debate Clause that the court interpreted read, "The freedom of deliberation, speech and debate, in either house of the legislature, is so essential to the rights of the people, that it cannot be the foundation of any accusation or prosecution, action or complaint, in any other court or place whatsoever." Mass Const, Part I, Art XXI.

functions of [the legislative] office" while the legislature was in session. *Id.* at 27-28. The court went so far as to state that it would not inquire into "whether the exercise [of the legislative function] was regular according to the rules of the house, or irregular and against their rules." *Id.* at 27. Nonetheless, the court did envision limits on the privilege, most notably that the privilege would not apply "[w]hen a representative is not acting as a member of the house." *Id.* at 28.

Applying that understanding, the court concluded that the defendant legislator was not protected by the Speech and Debate Clause. Although the court explained that the privilege would apply if the legislator had spoken defamatory words "in the execution of his official duty," the court concluded that the defendant had not "even contemplated that he was in the discharge of any official duty" when he referred to the plaintiff's prior alleged crime. *Id.* at 30-31. In particular, the court noted that, when the defendant made his comments, the resolution supported by the plaintiff was no longer before the house, the house had proceeded to consider other issues, the defendant did not call for reconsideration of the resolution, and the plaintiff was not a candidate for the notary position that was the subject of the resolution. *Id.* at 29-30. Thus, the court concluded that the defendant was not protected by the privilege. *Id.* at 36.

The court's interpretation in *Coffin* is in line with the text and context of Article IV, section 9, because it emphasizes the legislative function in determining the acts to which the Debate Clause applies. Here, even defendants agree that legislative functions are at the core of what is protected by the Debate Clause. The more difficult question is what falls within the scope of legislative functions protected by the privilege. *See Brewster*, 408 US at 515-16 (noting that interpretations of the federal Speech or Debate Clause have not "treated the Clause as protecting all conduct *relating* to the legislative process" and instead have been limited to "an act which was clearly a part of the legislative process—the *due* functioning of the process" (emphasis in original)).

c. Scope of Oregon's Debate Clause

We need not define the precise contours of the privilege in this case because on review, defendants have narrowed

the information that they seek from the co-chairs of the LAC. As defendants note, the Court of Appeals held that defendants were entitled to question the LAC co-chairs about "any instructions or other communications that they might have given to or had with the LAC administrator or others regarding *enforcement* (as opposed to *enactment*) of the overnight rule." *Babson*, 249 Or App at 302 (emphasis in original). Defendants did not challenge the court's limitation on defendants' questioning to matters involving enforcement. Instead, the state challenged the court's determination that defendants could question the LAC co-chairs at all in this case. Thus, the only question on review is whether defendants may question the LAC co-chairs about enforcement of the guideline. We conclude that they can because the enforcement of laws is outside the scope of the legislative function and because there was testimony from the Legislative Administrator that he had, in fact, had conversations with the LAC co-chairs about the guideline.

The Oregon Constitution vests the legislative power of the state in the Legislative Assembly, and the executive power of the state in the Governor. Or Const, Art IV, § 1(1) ("The legislative power of the state * * * is vested in a Legislative Assembly, consisting of a Senate and a House of Representatives."); Or Const, Art V, § 1 ("The chief [*sic*] executive power of the State, shall be vested in a Governor[.]"). Not only does the constitution forbid members from one branch from exercising the functions of another branch, but to the extent that the legislature has enforcement powers, those powers are explicitly set forth in the constitution. *See* Or Const, Art III, § 1 ("[N]o person charged with official duties under one of these [three] branches, shall exercise any of the functions of another, except as in this Constitution expressly provided."); Or Const, Art IV, § 16 (providing that either house, during its session, may "punish by imprisonment, any person, not a member, who shall have been guilty of disrespect to the house by disorderly or contemptious [*sic*] behavior in its presence"). Because enforcement is not generally part of the legislative function, extending the privilege to legislators' participation in some aspect of enforcement of a law would not serve the clause's purpose of allowing legislators to perform their *legislative* role without interruption

or fear of retribution. We therefore conclude that legislative members who participate in or specifically direct enforcement of a law against particular individuals may be questioned about that conduct because it is not protected under the Debate Clause of Article IV, section 9.[13]

In this case, however, the enforcement related to the legislature's control over the state capitol building, making the line between enactment and enforcement more difficult to draw. *Amicus* argues that controlling legislative property is a legislative act, even if control of legislative property requires enforcement of internal legislative rules. In support of that argument, *amicus* cites two federal cases where courts held that those who enforced internal rules governing access to the house floor and congressional galleries were protected by the legislative privilege. *See National Ass'n of Social Workers v. Harwood*, 69 F3d 622, 631-32 (1st Cir 1995) (concluding that common law legislative immunity extends to legislators and their aides who are "enforcing [a] rule as a part of their official duties," where rule involved access of certain lobbyists to House floor); *Consumers U. of U.S. Periodical Corr. Ass'n*, 515 F2d 1341, 1350-51 (DC Cir 1975), *cert den*, 423 US 1051 (1976) (concluding that "enforcing internal rules of Congress validly enacted under authority specifically granted to the Congress" is protected by the

---

[13] The state does not appear to dispute that conclusion. The state argued in its brief that "had President Courtney and Representative Hunt reached out to any executive official or agency about the [guideline], for instance, by directly calling Oregon State Police to arrest defendants, those actions might not fall within Article IV, section 9's scope." The state argues that that conclusion does not control the outcome here, however, because there is no evidence that the legislators reached out to any executive agency and because any communications that they did have were with the Legislative Administrator, who "was simply an extension of the legislators." As an initial matter, defendants are not bound by the lack of evidence about whether the legislators reached out to an executive agency, where the testimony of the legislators might provide that missing evidence. More importantly, the state's argument misconstrues the legislative function inquiry. The question is not *who* the legislators communicated with, but the *function* of the communication. Many of the legislators' conversations with the Legislative Administrator would be protected by Article IV, section 9, to the extent that they related to the enactment or amendment of the guideline. To the extent that the individual legislators directed the Legislative Administrator to direct the Oregon State Police to enforce the guideline in a particular way, however, that conversation would not be protected merely because the legislators used the Legislative Administrator as an intermediary in directing the executive agency to enforce the guideline in a particular way.

Speech or Debate Clause where rules involved access to congressional galleries).

Where internal rules govern the ability of the legislature to function, by, for example, regulating who has access to the house floor during debates, enforcement of those rules may be protected by the Debate Clause. In contrast, here, the guideline did not involve access to the floor of the legislature or the galleries and instead regulated use of the capitol steps, which are removed from where legislators generally engage in "debate." There is no indication that enforcement of the guideline against defendants was necessary to prevent interference with any legislative function. In addition, enforcement of the guideline was not carried out by a legislative employee. Rather, executive officials—the Oregon State Police—carried out enforcement, which resulted in citations for trespass. In this case, therefore, if individual legislators directed enforcement of the guideline against defendants, we think that they acted outside the legislative function of controlling legislative property.

We recognize that the line between enactment and enforcement may be difficult to draw in other cases as well. As the state notes, legislators enacting or amending a law often will consider the practical implications involved in enforcing a law. Similarly, after a law is enacted, legislators may want to understand how it is being enforced to determine whether a law should be amended or repealed. To the extent that legislators seek information about how a law would be or is being enforced, for purposes of enacting or amending legislation, those communications likely would be protected by the Debate Clause. When legislators become involved in actually directing or carrying out enforcement of a law, however, and they do so outside the process of enacting or amending a law, they cannot turn to the Debate Clause to shield their activities. *Compare Kilbourn*, 103 US at 200, 204-05 (concluding that legislators, who passed an invalid resolution directing house speaker to issue warrant for Kilbourn's arrest, were protected by Speech or Debate Clause because offering and voting on resolution are protected by that clause), *with Gravel v. United States*, 408 US 606, 625, 92 S Ct 2614, 33 L Ed 2d 583 (1972) ("Members of Congress are constantly in touch with the Executive Branch

of the Government and with administrative agencies—they may cajole, and exhort with respect to the administration of a federal statute—but such conduct, though generally done, is not protected legislative activity."). We think that trial courts can make the determination in the first instance as to whether questions seek to obtain information about legislative functions.

Here, the trial court granted the state's motion to quash the subpoenas of the LAC co-chairs and the court assumed that the legislators would assert the legislative privilege in response to defendants' questions. The trial court erred in its determination because the legislators could not have asserted the privilege in response to questions about their direct involvement, if any, in enforcing the guideline. Although Senator Courtney and Representative Hunt each filed affidavits stating that they did not witness defendants' arrests or interactions with state police, those affidavits do not address whether either legislator directed the Legislative Administrator or the state police to carry out those arrests or other citations. In addition, although the Legislative Administrator testified that he never received any information from the LAC co-chairs about how they wanted him to address the vigil, he also testified that he spoke to them about the guideline, and he answered numerous questions by stating that he could not remember whether certain conversations or interactions had occurred. Defendants are not required to accept that testimony where testimony from the LAC co-chairs, if it contradicted or was inconsistent with the Legislative Administrator's testimony, likely could have affected the trial court's determination about whether the enforcement was based on the content of defendants' expression. *See Davis*, 336 Or at 32 (stating that court will affirm trial court if "there was little likelihood that the erroneous exclusion" of evidence affected the outcome).

We emphasize that Article IV, section 9, is essential to the legislative function and that the judicial process must not be allowed to improperly intrude on the legislative process or unnecessarily burden the time and actions of individual legislators. The fact that limited inquiries of legislators are permitted in a case such as this, notwithstanding Article IV, section 9, does not countenance fishing

expeditions or harassment of legislators by parties in civil or criminal matters. Here, however, the information that defendants seek clearly relates to the enforcement, rather than the enactment, of the guideline, and evidence in the record indicates that the legislators who were subpoenaed had conversations with the Legislative Administrator regarding the guideline. For those reasons, we remand to allow defendants to question the LAC co-chairs about their involvement, if any, in enforcing the guideline against defendants.

### III. ARTICLE I, SECTION 26, OF THE OREGON CONSTITUTION

Article I, section 26, of the Oregon Constitution provides, "No law shall be passed restraining any of the inhabitants of the State from assembling together in a peaceable manner to consult for their common good; nor from instructing their Representatives; nor from applying to the Legislature for redress of greviances [*sic*]." In *Illig-Renn*, this court stated that Article I, section 26, is subject to the same analytical framework as Article I, section 8. 341 Or at 236. Because the parties agree that the *Robertson* framework controls the analysis of Article I, section 26, we will apply that framework for purposes of this opinion. Accordingly, similarly to the inquiry under Article I, section 8, we must determine whether the guideline is "written in terms" directed at restricting assembling, instructing representatives, and applying for redress of grievances; whether the guideline prohibits those activities as a means of causing some harm; or whether the guideline is focused only on restricting harmful effects.

In applying the *Robertson* framework, defendants note that the shorthand "assembly" is inadequate to refer to the rights protected by Article I, section 26, because there are three distinct rights protected by that provision: inhabitants of the state have the right to "assembl[e] together in a peaceable manner to consult for their common good," "instruct[] their Representatives," and "apply[] to the Legislature for redress of greviances [*sic*]." Or Const, Art I, § 26. Defendants provide an historical analysis of all three of those rights, and argue that, although the guideline implicates all three rights, it particularly impacts defendants' rights to instruct

their representatives and to apply for redress of grievances. Based on that analysis, defendants argue that the guideline is unconstitutional on its face under Article I, section 26, because the guideline, by its terms, restricts activities protected under that provision. Defendants also argue that the guideline is unconstitutional under Article I, section 26, under the third category of *Robertson* as applied to their conduct because they did not cause any harm when they engaged in protected activities.

The state responds that the guideline is valid on its face under Article I, section 26, for the same reasons that it is valid on its face under Article I, section 8. According to the state, the guideline does not, by its terms, target any of the rights protected under Article I, section 26, and it is not overbroad because it restricts those rights only in one location and only for a limited period of time each day. In addition, the state asserts that application of the guideline to defendants did not violate Article I, section 26, because the guideline was enforced based on defendants' conduct of trespassing, and not based on the fact that they were assembling, instructing their representatives, or applying for redress of grievances.

The Court of Appeals agreed with defendants that they were engaging in activity protected by Article I, section 26, when they were cited, but noted that that fact did not mean that their Article I, section 26, rights had been violated. *Babson*, 249 Or App at 305. The court went on to explain that the guideline is "assembly neutral" because it "does not expressly mention" or necessarily implicate any of the activities protected under Article I, section 26. *Id.* at 306. The court explained that, although the guideline prohibits *presence* on the capitol steps, "presence is not necessarily assembly for the common good," and, in fact, "is not even necessarily assembly" if only a single person is present. *Id.* Moreover, the guideline did not mention or necessarily implicate the right to instruct representatives or apply for redress of grievances. *Id.* at 307. Thus, the court concluded, defendants were left to challenge the guideline under Article I, section 26, as applied to their conduct under the third category of *Robertson*, and the court remanded on that issue. *Id.* at 307-08.

A. Robertson *Category One and Category Two*

In this case, analysis of the guideline under the first two categories of the *Robertson* framework does not require this court to further explore the meaning and scope of Article I, section 26, because, whatever the meaning and scope of that provision, the guideline's restriction on "[o]vernight use" of the capitol steps is not, by its terms, directed at assembling, instructing representatives, or applying for redress of grievances. Nor does the text of the guideline expressly or obviously include those rights as an element or "proscribed means" of causing a targeted harm.

In contrast, in *Ausmus*, the disorderly conduct statute at issue criminalized, in certain circumstances, "'[c]ongregat[ing] with other persons in a public place and refus[ing] to comply with a lawful order of the police to disperse.'" *Ausmus*, 336 Or at 498 (quoting *former* ORS 166.025(1)(e) (2003), *repealed by* Or Laws 2012, ch 35, § 1) (alteration added). The parties and the court readily concluded that the element of "[c]ongregat[ing] with other persons in a public place" described conduct protected by Article I, section 26, of the Oregon Constitution. *Id.* at 500. Here, the word "use" in the guideline does not lead to a similar conclusion. The fact that the word "use" can include or apply to the rights protected under Article I, section 26, does not mean that the guideline is directed, in terms, at those rights or that those rights are a proscribed means of causing a harm identified in the guideline. We agree with the Court of Appeals that the guideline on overnight use "prohibits *presence* on the capitol steps, but presence is not necessarily assembly for the common good," nor is it necessarily instructing representatives or applying for redress of grievances. *Babson*, 249 Or App at 306-07 (emphasis in original). A single person crossing the steps between 11:00 p.m. and 7:00 a.m. would violate the guideline, as would the mere storage of basketball equipment on the steps. The guideline is not directed, in terms, at the rights protected under Article I, section 26, and it does not expressly or obviously include those rights as a proscribed means of causing some harm. The guideline therefore survives scrutiny under the first two categories of *Robertson*.

## B. Robertson *Category Three*

As noted, our analysis under the third category of *Robertson* requires us to determine whether enforcement of the guideline impermissibly burdened defendants' rights under Article I, section 26, of the Oregon Constitution. Defendants appear to argue that, because they did not cause any harm to the capitol or any other property or persons, the guideline could not constitutionally be applied to their protected conduct. In other words, defendants seem to suggest that the government cannot enforce the guideline in a way that restricts their rights under Article I, section 26, unless they are causing "discernible harm."

That argument assumes that a restriction on the time of use intended to prevent harm to persons or property may be applied only when harm occurs. That is incorrect. *See Tidyman*, 306 Or at 189 ("If retail business is excluded from a residential zone to keep down heavy traffic and noise, the exclusion bars an antique store that attracts only a half dozen quiet visitors a day.").

Here, the guideline is a restriction on location and timing: "Overnight use of the steps is prohibited, and activities on the steps may be conducted only between 7:00 am and 11:00 pm, or during hours between 11:00 pm and 7:00 am when legislative hearings or floor sessions are taking place." Enforcement of the guideline in the absence of harm does not necessarily demonstrate that defendants' Article I, section 26, rights were targeted or impermissibly burdened. Instead, as we explain below, we must determine whether the enforcement was a reasonable restriction on the time, place, and manner of defendants' exercise of their Article I, section 26, rights.

For the reasons set forth in our analysis of the guideline under Article I, section 8, enforcement of the guideline against defendants advanced legitimate state interests in safety, security, and aesthetics, and left open ample alternative avenues for defendants to exercise their Article I, section 26, rights. We must separately examine, however, whether enforcement of the guideline was "neutral," in the sense that the government's enforcement of the law was not directed

at restricting defendants' rights under Article I, section 26. As stated above, however, we cannot resolve that issue on review because we have concluded that the trial court erred in granting the motion to quash the subpoenas of the LAC co-chairs. For the reasons outlined above, the trial court must determine whether enforcement of the guideline was neutral after it has had an opportunity to hear testimony from the LAC co-chairs about their role, if any, in enforcing the guideline against defendants.

## IV. THE FIRST AMENDMENT TO THE UNITED STATES CONSTITUTION

The First Amendment provides, in part, that "Congress shall make no law * * * abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." The First Amendment is made applicable to the states by the Due Process Clause of the Fourteenth Amendment. *Gitlow v. New York*, 268 US 652, 666, 45 S Ct 625, 69 L Ed 1138 (1925).

As noted, defendants argued before the trial court and the Court of Appeals that the guideline violates the First Amendment. The trial court rejected that argument, and the Court of Appeals declined to reach the First Amendment issue, reasoning that "any opinion [it] might render based on the First and Fourteenth Amendments would be premature" because the court had not yet determined "whether the state's law * * * ha[d] deprived defendants of the rights they [sought] to vindicate under the United States Constitution." *Babson*, 249 Or App at 307. The Court of Appeals based that conclusion on this court's well-established "first things first" doctrine. *Id.* at 307, 307 n 6. As this court has explained, "first things first" requires the court to consider state law claims first because "the state does not deny any right claimed under the federal Constitution when the claim before the court in fact is fully met by state law." *Sterling v. Cupp*, 290 Or 611, 614, 625 P2d 123 (1981).

On review, defendants argue that, at least for some federal constitutional violations, "first things first" is no longer viable, citing *Zinermon v. Burch*, 494 US 113, 125, 110 S Ct 975, 108 L Ed 2d 100 (1990), in which the United

States Supreme Court stated that certain federal constitutional violations are "complete when the wrongful action is taken." We need not address defendants' argument, however. Even if we assume that defendants are correct that we are not *required* to resolve state law claims before reaching federal law claims—a matter we do not decide here—there are sound reasons for doing so. *See* Wallace P. Carson, Jr., *"Last Things Last": A Methodological Approach to Legal Arguments in State Courts*, 19 Willamette L Rev 641, 648-49 (1983) (advocating first resolving claims under state constitutional law, before addressing federal constitutional law, to provide stability, allow for independent state protection of individual rights, and eliminate guesswork on how the United States Supreme Court will interpret the federal constitution). Because defendants' state law claims are unresolved, we decline to address defendants' First Amendment argument.

## V.   CONCLUSION

Article I, section 8, is a "very broad prohibition" on restraints on expression, and its "sweeping terms" extend to the kind of vigil defendants engaged in here and even to "the kinds of expression that a majority of citizens in many communities would dislike." *State v. Ciancanelli*, 339 Or 282, 293, 311, 121 P3d 613 (2005). Moreover, we recognize the social and personal value of protest and, often, of protest at a particular time and place—such as a continuous peace vigil at the state capitol. A good argument can be made that the legislature should permit such vigils as part of the public debate over contested state policies. The question here, however, is whether the Oregon Constitution bars the legislature from limiting use of the capitol steps for any purpose, including protesting, to the hours of 7:00 a.m. to 11:00 p.m. (except when legislative hearings or floor sessions are taking place). It does not. Our cases teach that the fact that expression is protected does not mean that it is exempt from content-neutral, speech-neutral laws and regulations. *See Tidyman,* 306 Or at 182 ("A regulation is not always unconstitutional because it restricts one's choice of a place or time for self-expression * * * when that is not the object of the regulation."). Applying that same analysis, the rights protected under Article I, section 26, similarly

are not exempt from neutral laws that do not target assembling, instructing representatives, or applying for redress of grievances. The Oregon Constitution does not prohibit the government—in this case, the Legislative Administration Committee—from enacting laws in terms that do not target speech or the rights protected under Article I, section 26, even if those laws may have some incidental impact those rights, as the guideline at issue here does.

For the reasons discussed above, on its face, the guideline does not violate Article I, section 8, or Article I, section 26, of the Oregon Constitution. The case must be remanded, however, to permit defendants to question the co-chairs of the LAC about their role, if any, in enforcing the guideline against defendants. Based on that testimony and the other testimony presented, the trial court must determine whether enforcement of the guideline was a reasonable restriction on the time, place, and manner of defendants' expression and assembly, or whether it targeted defendants because they were engaged in expression and assembly, and therefore violated Article I, section 8, and Article I, section 26, as applied to defendants. Because of our resolution of that issue, we do not reach defendants' First Amendment argument.

The decision of the Court of Appeals is affirmed. The judgment of the circuit court is affirmed in part and reversed in part, and the case is remanded for further proceedings.