No. 578          August 21, 2024          437

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

JAMES WILLIAM COOK,
aka James William Cook, Jr.,
*Defendant-Appellant.*

Grant County Circuit Court
21CR26992; A177498

Robert S. Raschio, Judge.

Argued August 10, 2023.

Peter G. Klym, Deputy Public Defender, argued the cause for appellant. Also on the brief was Ernest G. Lannet, Chief Defender, Criminal Appellate Section, Office of Public Defense Services.

Carson L. Whitehead, Assistant Attorney General, argued the cause for respondent. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Shorr, Presiding Judge, Mooney, Judge, and Pagán, Judge.

SHORR, P. J.

Reversed.

**SHORR, P. J.**

Defendant appeals from a judgment of conviction for one count of telephonic harassment, ORS 166.090(1)(c).[1] In his sole assignment of error, he asserts that the trial court erred in denying his motion for judgment of acquittal (MJOA). He contends that the statute on which his conviction is based is facially overbroad or, if not facially overbroad, that it is unconstitutional as applied to the facts of this case. We conclude that the statute as applied to defendant violated his rights under Article I, section 8, of the Oregon Constitution, and, accordingly, we reverse.

We review the question whether ORS 166.090(1)(c) violates Article I, section 8, of the Oregon Constitution[2] as a matter of law. *State v. Rangel*, 328 Or 294, 298, 977 P2d 379 (1999).

The underlying facts are undisputed. Defendant was convicted after a jury trial of telephonic harassment based on text messages he sent to his ex-wife, K. Defendant and K, who were divorced in April 2019, have two children. The children lived with K, and defendant had parenting time every other weekend. Defendant and K generally communicated about parenting issues and parenting time via text message.

On October 27, 2020, defendant and K exchanged text messages. K's last text message that day stated, "Leave me alone jimmy" and defendant replied, "Later, tweaky bird." The following day, defendant began a text message exchange with K—the messages that are the basis of his conviction—by sending two messages: "Hey how's everyone

---

[1] ORS 166.090(1) states, in part:

"A telephone caller commits the crime of telephonic harassment if the caller intentionally harasses or annoys another person:

"* * * * *

"(c)  By sending to, or leaving at, the other person's telephone a text message, voice mail or any other message, knowing that the caller has been forbidden from so doing by a person exercising lawful authority over the receiving telephone."

[2] Article I, section 8, of the Oregon Constitution states, "No law shall be passed restraining the free expression of opinion, or restricting the right to speak, write, or print freely on any subject whatever; but every person shall be responsible for the abuse of this right."

in hell?" and "I mean, how is everyone living with you. Are [the children] doing good?" That exchange continued:

"[K:]   Kids are fine.

"[Defendant:]   What r they doing?

"[K:]   [C] in school sis playing

"[Defendant:] Do you even know or are you still telling to 'go away!' and 'leave me alone!'

"[K:]   Leave me alone

"[Defendant:]   Why not work on number and letters since you guys have this quality time?

"[K:]   Leave me alone jimmy

"[Defendant:]   Try giving a fuck about their mental health and growth!? Because you never did? They aren't just pawns in your little game. Read, write, draw, ect.. with them. Try loving them

"[Defendant:]   I can't expect you to help them grow as people because you still don't know how.

"[Defendant:]   [meme photo with text 'YOU SAY YOU QUIT THE METH……YOUR TORE UP FACE AND GIANT PUPILS DETERMINED THAT WAS A LIE']

"[K:]   Leave me the hell alone jimmy

"[Defendant:]   I want to make sure my children are taken care of. That's their minds and bodies. I don't think you can. Bodies yeah, you can. Mentally they need to be away from you.

"[K:]   For the love of god just fucking stop leave me alone

"[Defendant:]   Do you feel attacked when the truth is thrown in your face or something? I know you aren't familiar with tell the truth so its probably hard for you to hear."

K contacted the John Day Police Department and spoke with Officer Durr about filing a complaint or stopping defendant from texting her. Durr collected screenshots of the text messages from K's cell phone.

Defendant was ultimately charged by information with telephonic harassment under ORS 166.090, in part:

"The defendant, on or about October 28, 2020, in Grant County, Oregon, did unlawfully and intentionally harass or annoy [K] by sending to or leaving at the telephone [of] such other person a text message or voice mail or message, defendant knowing that defendant had been forbidden from doing so by a person exercising lawful authority over the receiving telephone."

At defendant's jury trial, K agreed during her testimony that she would have been able to text with defendant if it involved the children and that she would not have told defendant to leave her alone if he was talking about "parenting stuff." After the state rested, defendant raised an MJOA, asserting, in part, that his text messages to K were protected speech under Article I, section 8, of the Oregon Constitution. The trial court denied the MJOA. Relying on *State v. Koenig*, 238 Or App 297, 242 P3d 649 (2010), *rev den*, 349 Or 601 (2011), the court stated that it believed "that the jury can consider the content of a message for the purposes of determining whether or not it is harassing or annoying to the other party" and that "it isn't an Article I, Section 8, problem if the jury considers expressive conduct in determining whether or not the person was trying to intentionally harass or annoy the other person."[3]

The trial court also concluded that under the statute in question, "a person could commit the crime of telephonic harassment by sending a text after being told not to send a text" and then "the receiving party could later text that individual, reinstituting communication" and would again need to tell the sender to stop in order to eliminate further communication via text messages. The court determined, viewing the facts in the light most favorable to the state, that "there was a context set up for texting that it was to be related to the children and the children's care" and when "[d]efendant veered course and started sending personally-offensive and harassing messages to [K], [K] responded by telling him to stop." Defendant then

---

[3] In *Koenig*, we stated, "[T]he expressive conduct identified by defendant (his speech during the telephone calls) is not relevant to proving the forbidden result (harassment), *** rather, that expressive conduct, along with other evidence, is relevant to show defendant's intent. *** Criminal laws are not unconstitutional under Article I, section 8, simply because that culpable mental state might be proved by expressive conduct." 238 Or App at 303.

"persisted * * * to send additional messages in direct contravention of [K] saying, 'Don't contact me via text in the way that you are.'" The trial court acknowledged that the statute "is a little problematic" and "the facts in this case are problematic because [defendant] did establish a texting relationship for purposes of communicating with each other about the children, and he was allowed to communicate with her on that level." But, according to the trial court, once the content of the messages shifted to what the jury could construe as being harassing and annoying, K could tell him to stop; however, "he persisted." The jury ultimately found defendant guilty, and defendant appealed.

The analytical framework for evaluating a law's constitutionality under Article I, section 8, is set forth in *State v. Robertson*, 293 Or 402, 649 P2d 569 (1982).

> "Under *Robertson*, a law is unconstitutional if it is 'written in terms directed to the substance of any "opinion" or any "subject" of communication' unless the scope of the restraint is 'wholly confined within some historical exception[.]' *Id.* at 412. If a law is not directed at the substance of any opinion, a court must nonetheless determine whether the law focuses on forbidden effects and 'the proscribed means [of causing those effects] include speech or writing,' or whether it is 'directed only against causing the forbidden effects.' *State v. Babson*, 355 Or 383, 391, 326 P3d 559 (2014) (quoting *Robertson*, 293 Or at 417-18). 'If the law focuses on the forbidden effects, and the proscribed means of causing those effects include expression, then the law is analyzed under the second *Robertson* category.' *Id.* Under that category, we determine 'whether the law is overbroad, and, if so, whether it is capable of being narrowed.' *Id.* If the law focuses only on forbidden effects, the law falls into the third *Robertson* category, and an individual can bring an as-applied challenge to the law."

*State v. Smith*, 319 Or App 388, 390, 510 P3d 217, *rev den*, 370 Or 404 (2022) (brackets in *Smith*).

On appeal, defendant contends that the trial court erred when it denied his MJOA because the telephonic harassment statute, ORS 166.090(1)(c), violates Article I, section 8, on its face or, in the alternative, as applied to his conduct. That is, he contends that the statute is unconstitutional

under the second or third *Robertson* categories. The state argues that ORS 166.090(1)(c) is constitutional under both of those categories.

We begin with defendant's argument that ORS 166.090(1)(c) falls under the second *Robertson* category and that it is unconstitutionally overbroad because it prohibits privileged speech. ORS 166.090(1) states:

"A telephone caller commits the crime of telephonic harassment if the caller intentionally harasses or annoys another person:

"(a) By causing the telephone of the other person to ring, such caller having no communicative purpose;

"(b) By causing such other person's telephone to ring, knowing that the caller has been forbidden from so doing by a person exercising lawful authority over the receiving telephone; or

"(c) By sending to, or leaving at, the other person's telephone a text message, voice mail or any other message, knowing that the caller has been forbidden from so doing by a person exercising lawful authority over the receiving telephone."

Defendant argues that ORS 166.090(1)(c) is written to focus on a harm, that harm being harassment or annoyance, but the means of achieving that harm necessarily involve expression—by sending a text message, voicemail, or other message. He argues that it is not expression neutral because it involves leaving a message intended to harass or annoy. The state responds that the text of paragraph (1)(c) targets conduct—the act of "sending" or "leaving" a text message or voicemail on the victim's phone with the intent to harass or annoy—the statute does not target expression itself and it does not matter what the text message says.

We agree with the state that ORS 166.090(1)(c) is not unconstitutional on its face. "[A]s a general rule, to warrant review for facial overbreadth, a law must expressly restrain speech." *State ex rel Rosenblum v. Living Essentials, LLC*, 371 Or 23, 55, 529 P3d 939 (2023). Nothing in the statute requires that the content of the text be harassing or annoying. Rather, the statute requires that "the caller

intentionally harasses or annoys another person" by "sending to, or leaving at, the other person's telephone a text message" when that person knows that they have been forbidden from doing so. The *intent* of the person who sends the text message must be to harasses or annoy, but the actual text message itself could be anything. It is the act of sending the text itself that is the proscribed means of causing the harm.

We turn to defendant's argument that ORS 166.090(1)(c) is unconstitutional as applied to him. "To determine whether a 'category three' law violates Article I, section 8, as applied to particular conduct, 'the court must examine how the law was applied to determine whether the application was directed at the content or the expressive nature of an individual's activities, advanced legitimate state interests, and provided ample alternative opportunities to communicate the intended message.'" *State v. Pucket*, 291 Or App 771, 774-75, 422 P3d 341, *rev den*, 363 Or 727 (2018) (quoting *Babson*, 355 Or at 408). That is, a facially valid statute may violate Article I, section 8, if it is applied "so that it did, in fact, reach privileged communication." *City of Eugene v. Miller*, 318 Or 480, 490, 871 P2d 454 (1994).

Defendant argues that he was convicted for the *content* of his messages, which reached privileged communication. Defendant argues that, here, K sought only to forbid him from sending messages with particular communicative content, and, further, that the trial court explicitly relied on the communicative content of defendant's speech when it denied his MJOA. The state does not dispute that defendant's text messages are communications that are subject to protection under Article I, section 8. However, the state contends that defendant was convicted for the act of sending the text messages, not because of the content of the messages.

Defendant asserts that the scenario here is analogous to that in *Miller*, 318 Or 480, in that his prosecution reached privileged communication. In *Miller*, the defendant was convicted of violating a sidewalk vending ordinance and the Supreme Court agreed with the defendant that, as applied to him, the ordinance violated Article I, section 8, because it "unreasonably impinge[d] on the dissemination of expressive material that is itself protected under Article I, section 8." *Id.*

at 482, 486. The defendant was cited for selling a joke book to a pedestrian on a sidewalk in violation of an ordinance that permitted licensed vendors to sell only food, beverages, flowers, or balloons that were designated on the license. *Id.* at 483. The court applied the third *Robertson* category and concluded that as applied to the defendant, the ordinance unconstitutionally denied the defendant "the same opportunity for the public sale of his expressive material goods that [was] given to vendors of other products." *Id.* 491-92.

In contrast, in *Pucket*, another case in which a defendant asserted an "as applied" challenge, we concluded that a disorderly conduct statute did not violate Article I, section 8, as applied to the defendant. In that case, the defendant was standing on the sidewalk in front of a Fred Meyer store using an electrified bullhorn to preach to passersby. 291 Or App at 772. He was convicted of second-degree disorderly conduct for recklessly creating a risk of public inconvenience, annoyance, and alarm by making unreasonable noise. *Id.* The trial court denied the defendant's MJOA after concluding that the defendant had been arrested for making unreasonable noise rather than for the content of his speech. *Id.* at 774. The defendant had been warned by police officers that "he was free to speak his mind but could not use the bullhorn to make an unreasonable noise" and employees and customers from nearby businesses complained about the noise; there was nothing in the record that suggested that the complaints were based on the content of the defendant's message. *Id.* at 775-76. In addition, officers testified that they arrested the defendant because of the volume and duration of his noise. *Id.* at 776. Given the record, we agreed with the trial court that the "defendant's prosecution was *not* 'directed at the content or the expressive nature of [his] activities.'" *Id.* at 776 (quoting *Babson*, 355 Or at 408 (emphasis and brackets in *Pucket*)); *see also State v. Rich*, 218 Or App 642, 651, 180 P3d 744 (2008) (disorderly conduct statute was applied against the defendant because of the noncommunicative elements of his speech and was not unconstitutional as applied to him).

Defendant argues that the evidence shows that K sought to prohibit only certain of defendant's text messages

that she perceived as demeaning or insulting—in other words, she sought to forbid messages with particular communicative content. The record supports that assertion. In its opening statement, in a preview of its evidence, the state told the jury that in the text messages, K

> "[is] asking [defendant] to please not make derogatory comments to her this way, and just, let's talk about the kids.
>
> "So you'll see messages between the two of them that are about children, * * * and then you'll see messages that come from him to her that are derogatory. And you'll see messages from her to him telling him to stop, which is what the statute indicates."

The state called Officer Durr to testify. He explained that he received a call from K, who wanted to talk to him about filing a complaint or stopping defendant from texting her. He collected screenshots of text messages between K and defendant and agreed, when questioned, that the messages contained derogatory statements from defendant to K but did not contain derogatory statements from K to defendant. Durr agreed that it is a crime when a person sends text messages after they have been advised not to.

As the prosecutor's opening statement asserted it would, K's testimony indicated that K wanted to prevent only certain kinds of text messages from defendant. K testified that it was "[n]ot a problem" if defendant were to text her about the children needing a coat or defendant picking up the children. She also testified that, "We have to get along. If you can't not [*sic*] get along, don't talk." She explained that she responded to defendant's texts with all of the "leave me alones" because she did not want to engage in a fight with defendant—she did not "want the petty game." K agreed that she would not have told defendant to leave her alone if he was "talking about parenting stuff." In re-direct testimony, K was asked by the state if she felt harassed by certain text messages, and she responded, "A little. It's more he's just mocking me though." When asked if she felt like it was annoying, she replied in the affirmative.

The state argues that the evidence was sufficient to convict defendant for the act of sending the text messages. It points to the fact that that the trial court instructed the

jury that the content of defendant's speech was protected by the constitution and that it could only consider the content of the messages to consider what defendant's intent was when he sent them. The state also notes that its closing argument reflected the same correct understanding of the law expressed in the jury instructions. The state also argues that Article I, section 8, does not prevent private citizens, like K, from making content-based distinctions in what messages can be sent to their phone.

There are several problems with the state's arguments. First, although K is a private citizen, this case involved state actors in the prosecution of defendant. This is not a situation where one person privately told another person not to send certain kinds of text messages. K involved the police, as she was entitled to do, and the state prosecuted defendant. In addition, although there were aspects of the way this case was presented to the jury that attempted to apply the statute without reaching the content of protected communication—that once a person is told not to text, they cannot text—the only evidence was that certain texts to K were acceptable, and others were not. Despite the jury instructions indicating that the content of the texts was relevant only to defendant's intent, the only evidence that the texts had the required result of harassing or annoying K was based on their content. On this record, we conclude that ORS 166.090(1)(c) as applied, reached privileged communication, and impermissibly burdened defendant's right of free speech.[4]

Reversed.

_____

[4] In reaching this result, we do not intend to minimize the nature of the texts defendant sent. We also note that our ruling is specific to this statute and the record before us. We express no opinion on the ability of courts to put parameters around communication between parties in matters involving, for instance, domestic relations or protective order situations.